# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# MIDDLE  DIVISION

| | | |
|---|---|---|
| **JEFFREY MURPHREE,** | ] | |
| **Plaintiff,** | ] | |
| | ] | |
| **v.** | ] | |
| | ] | |
| **CAROLYN W. COLVIN,** | ] | **CV-12-BE-1888-M** |
| **COMMISSIONER, SOCIAL SECURITY** | ] | |
| **ADMINISTRATION,** | ] | |
| **Defendant.** | ] | |
| | ] | |
| | ] | |

## MEMORANDUM OPINION

This employment discrimination case based on race is before the court on "Defendant's

Motion for Summary Judgment" (doc. 18) with supporting brief (doc. 19) and evidentiary material

(doc. 21). The Plaintiff has filed a response (doc. 24), and the Defendant filed a reply (doc. 31); this

matter has received thorough briefing. For the reasons stated in this Memorandum Opinion, the court

will DENY the motion as to the retaliation claims involving Murphree's suspension in June of 2008

and his failure to receive the 2008 ROC award and will GRANT the motion as to all other claims.

## I.  FACTS[1]

The Plaintiff, Jeff Murphree, a Caucasian, alleges that his employer, the Defendant Social

---

[1] The court notes that the Plaintiff's disputes with Defendant's facts are not always
presented in a way that the court may verify them. For example, in Plaintiff's "dispute" for
Defendant's fact 13, he cites to PEX 17, pp. 90-92, which does not exist. The cite cannot be a
typo meaning PEX 7, because PEX 7 is less than 20 pages.  The cite cannot be a typo meaning
DEX 17, because DEX 17 is a short, five-page document. In responding to Defendant's facts 14,
15, 19, 20, Plaintiff refers back to his flawed response to 13.

Security Administration ("the Agency"), discriminated and retaliated against him based on his race.

*Murphree's Employment History with the Agency Before 2007 Alabama DAD Selection*

Since August of 2002, Murphree served as a GS-14 District Manager ("DM") for the Agency office located in Gadsden, Alabama.  He has over eighteen years of service with the Agency.  At some point during his employment with the Agency, Murphree worked under then Alabama Area Director ("Alabama AD") Charles Wofford, who is Caucasian, and the two men had a close working relationship.  Beginning in 2007, Murphree's first-line supervisor was Alabama AD Rose Mary Buehler, who is Asian American.  Claudia Harris, who is Caucasian, held the position of Acting Deputy Area Director ("Acting DAD") during part of Murphree's tenure, and she occasionally served as Acting AD in Buehler's absence.  However, Buehler, and not Harris, handled work performance appraisals for district managers, including Murphree.

Before his protected conduct in December of 2008, discussed in detail subsequently, Murphree had received no discipline and had earned annual awards at work, always at the high Recognition of Contribution "ROC" level.  In October of 2007, Buehler rated Murphree's performance for fiscal year 2007, which ended on September 30, 2007, as a 5/5 (Outstanding Contribution) in the categories of "interpersonal skills," "participation," "demonstrates leadership," and "manages performance."  She rated him a 3/5 (Successful Contribution) in the categories of "demonstrates job knowledge" and "achieves business results."  As a result of these ratings, Murphree received a 4.3/5 overall rating for the year.

Also in October of 2007, the Agency's Operations Supervisor ("OS") at the Gadsden office, Jacque Allen, who is African American, told Murphree of her belief that Michelle Garrison, a claims representative who worked out of that office and whose race was not specified in the briefs,

improperly denied a Social Security claim "just to get rid of it."  (Doc. 21-11, at 31 p. 122).

Murphree asked Buehler for her advice about handling this integrity issue, and she advised that he

discuss the matter with labor relations.   Apparently, Murphree got someone in the labor relations area

involved initially but did not follow-up to Buehler's satisfaction.  When the matter had not been

resolved by the end of November of 2007, Buehler asked Lana Turner from her office to ask

Murphree what actions he was taking with labor relations about the Garrison matter.  Buehler also

subsequently spoke directly with Murphree about the matter, encouraging him to be more proactive in

obtaining a timely resolution.  In her deposition testimony, Buehler characterized Murphree's

handling of the Garrison claims matter as showing a lack of initiative. She also questioned whether he

was providing her with full disclosure, because in this incident and others he gave her information in

a piecemeal fashion, requiring her to ask him for more information.  Buehler did not write up

Murphree or discipline him because of this incident.

Eventually, Murphree proposed a short-term suspension of Garrison because of the incident.

During this time frame when Murphree was attempting to address Garrison's misconduct, Garrison

requested and apparently received a transfer from the Gadsden office to the Albertville office, which

Murphree did not manage.  Garrison later accused Murphree of sexual harassment during the five-

year course of working with him, as discussed below.  Regional Commissioner Paul Barnes, who is

African American, asked Buehler to delay disciplinary action against Garrison regarding the claim

incident until the Agency received the results of the sexual harassment investigation.  Deputy

Commissioner Leon Rhodes, who is also African American, subsequently informed Buehler that the

disciplinary action against Garrison for wrongfully denying a claim was going to be tabled; he

explained to Buehler that a long period of time had elapsed since the original fact-finding interview

3

and that the situation was very sensitive given Garrison's subsequent sexual harassment allegations. Buehler had reservations about the decision to table Garrison's discipline, because if the discipline did not occur she "knew it was a matter of time [] before [Garrison] did something else." (Doc. 21-5, at 92). Buehler communicated those reservations to Rhodes, but the discipline was tabled despite Murphree's recommendation and Buehler's reservations about tabling it.

*Selection of the Alabama DAD*

At the time Buehler became the AD for Alabama, no permanent Deputy Area Director existed for the state; as noted previously, Harris, who is Caucasian, was holding the position of Acting DAD because Barnes had received authority to appoint a *temporary* DAD. However, in 2007, the Agency revised its criteria for this position and, under the revised criteria, Alabama became eligible to select a *permanent* DAD. During a management meeting in Orlando, Florida, Buehler verbally informed the Alabama DMs that the position had been approved. In subsequent conversations with Buehler, both Murphree and the person eventually selected for the position, Otto Wilson, who is African American and who served as a GS-14 DM in Birmingham, expressed to Buehler their intent to apply for the position.

According to Murphree, he expressed concern to Buehler at the Orlando meeting that he feared his race and his close association with Charlie Wofford would mean that Barnes would prevent him from obtaining the position. When Buehler told him she knew nothing about a conflict between Barnes and Wofford, Murphree told her that he understood the two men did not like each other and that a deep and bitter racial conflict existed between the two. (Doc. 21-11, at 52). Murphree followed up this conversation with more expressions to Buehler of his interest in the Alabama DAD position.

A dispute exists whether Buehler advised Murphree that she would like him to be her DAD

and planned to recommend him for the position; Murphree says that she did so and told him to talk to his wife about moving to Birmingham, whereas Buehler testified that she merely encouraged him to apply, an encouragement she gave to every DM who expressed an interest in the DAD position. Murphree also testified that Buehler acknowledged that she would need Paul Barnes to concur with her recommendation of Murphree.

Gail Earley, who was a Management Analyst in the Alabama AD's office in 2007, testified by affidavit that she advised Buehler that Murphree would be a good selection for the DAD position. Earley further stated in her affidavit that Buehler told her that Murphree would be a "good fit" for the DAD and that Buehler intended to talk to Barnes about placing Murphree in that position. Earley does not state the time frame of her conversation with Murphree, so the facts do not reflect whether this conversation occurred before or after Buehler learned that Wilson would also be a candidate. In her deposition, Buehler testified that her recollection of the conversation with Earley about Murphree was that Buehler simply thanked Earley for sharing her opinion and did not give Earley any indication of her own choice for the position.

*Noncompetitive Selection Process and the DAD Position Background*

On November 26, 2007, the Agency sent an email to GS-14 employees in Region IV, the Region including Alabama, soliciting interest in a "lateral reassignment" to the Alabama DAD position with statements of interest due by December 3, 2007. (Doc. 21-7, at 5-6). Murphree and Wilson both responded, and their names were included in the list of four candidates provided to Regional Commissioner Barnes and Deputy Regional Commissioner Rhodes, both of whom are African American. The form listing the four candidates instructed the selecting official that the candidates were eligible for a "noncompetitive assignment." (Doc. 21-7, at 3).

5

Murphree and the Agency disagree over whether this lateral reassignment would require the use of competitive procedures.  The Agency policy on reassignments, S335-7, provides "Agencies must use competitive procedures when reassigning career or career conditional employees to position with greater promotion potential than positions previously held on a permanent basis."  (Doc. 21-48).  The crux of the disagreement is whether the DAD position has greater promotion potential than the GS-14 DM position.  The description of the DAD is as follows:

> Serves as full deputy and "alter ego" to the Area Director (PD# 6B399S).  Shares responsibility with the Director in all administrative and operational functions.  In the absence of the Area Director, assumes responsibility for the Area Operations and acts on any and all matters with full authority for commitment on matters within the jurisdiction of the Area Supervisor.

(Doc. 21-47, at 3).

 Liz Clevenger, who is an AD in Tennessee, testified that she was part of the national work group that was responsible for the creation of the DAD position.  The work group discussed whether the new DAD position would be considered as a stepping stone to the AD position, or, put another way, whether the work group should structure the DAD position so that the person holding the DAD position would normally move up to the AD when a vacancy occurred there.  A majority of the work group recommended that the DAD position should *not* be considered as a stepping stone to the AD position and that the incumbent DAD should have *no* entitlement to the AD position when a vacancy arose; rather, the DAD position represented another GS-14 position, and when vacancies occurred in the AD position, all GS-14 holders would be eligible to be considered, depending on their individual talents and experiences.  Clevenger stated that in certain circumstances a candidate other than the DAD would be a stronger candidate for AD, and that she knew of more than one Level 1 DM in Tennessee whom she would support to move

directly from the DM position to an open AD position.  Similarly, Buehler testified that she did not agree with the assertion that a Level 1 DM should have experience as a DAD before being promoted to the position of AD; rather, a Level 1 DM could be promoted straight to the AD position.

Barnes testified that two out of the last three AD positions were filled by DAD personnel. Obviously one of the three did not move up from a DAD position.  The two DAD personnel who were selected for the AD had qualifications and experience outside of their normal DAD duties, including their participation in the national Advanced Leadership Program.

Both the Alabama DAD position and the DM position are GS-14 level positions.  The evidence does not reflect that, prior to the selection of Wilson as Alabama DAD, the Agency performed similar DAD selections on a competitive basis in other states.

### Candidates for Alabama DAD

At the Area Director's meeting in Atlanta in early December of 2007, Barnes and Rhodes gave Buehler the list of four candidates and asked her to provide a recommendation regarding who should receive the position. Buehler did not discuss with either of them her recommendation for the position on the day she received the list or prior to that day.[2]  Buehler ultimately decided

---

[2] Although Murphree attempts to dispute whether Buehler discussed with Rhodes and/or Barnes at this point who should receive the position, the "evidence" cited is hearsay (a conversation between Murphree and Harris regarding what Buehler told Harris about a previous conversation between Buehler and Barnes). Buehler and Barnes testified that no such discussion occurred. Harris testified that Buehler never told her Buehler recommended Murphree to Barnes for the job and that Buehler never told her anything at all about her conversations with Barnes or Rhodes about the selection of the Alabama DAD.  Harris also testified that she never told Murphree that Buehler recommended Murphree, and that she has not seen any emails, faxes, or letters between Buehler and either Barnes or the Atlanta office concerning the Alabama DAD position that Wilson filled.

to recommend Wilson for the position.  As the supervisor of both Wilson and Murphree, she was already familiar with both of those two candidates' backgrounds, as well as their strengths and weaknesses, and she did not consider the statements of interest that they submitted nor did she consider the contents of their personnel files.

*Buehler's Testimony Regarding Her Reasons for Choosing Wilson over Murphree*

In her deposition testimony, Buehler provided reasons for her selection of Wilson over Murphree.  She stated that Wilson had a "regional presence," meaning that he enjoyed a reputation in the region as a problem-solver with good interpersonal skills and had taught regional classes with highly complimentary comments from those attending.  According to Buehler, Wilson also has the following qualities: he is motivated, shows good initiative, has a good rapport with people and good communication skills, and he did a good job of making a presentation to Buehler about his district for the Alabama managers' meeting.  Further, Charlie Wofford, the AD before Buehler, had said very positive things about Wilson, stating that he had sent Wilson to the Birmingham office to address a number of long-standing employee relations issues there following the reassignment of the former Birmingham DM, and that Wilson was "doing great" and was responsible for "turning the ship around."  (Doc. 21-5, at 135-39).  Finally, Buehler explained that she selected Wilson because he "had had a great deal of labor relations experience in terms of he worked in the three largest offices in Alabama with the most labor relations problems in the area: the offices in Mobile, Montgomery, and then Birmingham Downtown." (Doc. 21-5, at 161-62).

As to Murphree, Buehler testified that Murphree did not perform as successful of a presentation about his district at the Alabama managers' meeting because his presentation was

not completed within the time frame given and he appeared extremely nervous[3].   Buehler

explained that Murphree is not decisive[4] and sometimes needs "reassurance and guidance when

making a decision that I feel like he should be able to make," so she would not describe him as a

problem-solver.   While Buehler feels that Murphree has good inter-personal skills, she had some

concerns about his ability to deal with tough labor relations issues relating to his ability to

successfully deal with unions and relating to his handling of Garrison's misconduct on a claims

matter.   As already noted, Buehler characterized Muphree's handling the Garrison claims

incident as reflecting a lack of initiative and lack of full disclosure.   (Doc. 21-5, at 144, 146, 147-

48).

### Other Evidence Regarding Qualifications

The evidence reflects that, at the time of selection, Murphree had been a Level 1 DM for

over five years whereas Wilson had served as a Level 1 DM for less than one year.   Murphree

also had more longevity with the Agency: he has worked there about sixteen years whereas the

evidence set out in the briefs does not reflect how long Wilson was employed by the Agency

before his 2000 position as Operations Supervisor at the Mobile Office.   Murphree had also

---

[3]Although Murphree states in his own declaration attached to the responsive brief that he "has demonstrated great skill at public speaking and presentations, and has done well and spoken appropriately at all manager's meetings at which he has been asked to speak," his conclusory personal opinion about his own abilities does not create a genuine issue of material fact as to *Buehler's* evaluation of his abilities. *See Guinn v. AstraZeneca Pharm. LP,* 598 F. Supp. 2d 1239, 1242 (M.D. Fla. 2009) (stating that "[c]onclusory allegations, evidence that is not significantly probative, and personal opinions do not suffice to defeat a motion for summary judgment," citing *Johson v. Fleet Fin., Inc.,* 4 F.3d 946, 949 (11th Cir. 1993)).

[4] Although Murphree states in his own declaration attached to the responsive brief that he is a decisive manager, his own conclusory characterization of himself does not create a genuine issue of material fact as to Buehler's evaluation.

served as a Level II DM in Kentucky prior to his assignment to Gadsden, and had also worked in a development assignment as Level II DM in George in the Atlanta Management Development Program, whereas Wilson had no Level II management experience.  Murphree had mentored management employees throughout his years with the Agency through a Mentors for Managers Program, and was mentoring three Alabama management employees at the time of the selection. He also taught training classes for new employees, and served on promotion panels for DM positions as well as serving on leadership development programs at the regional and national level.  Although Murphree's declaration asserts that "[t]he offices that I have managed have as much or more labor management relations activity and management challenges as those managed or supervised by Wilson," he does not explain how he would have personal knowledge of the activity and management challenges at any office other than where he worked. (Doc. 24-7, at 3).

However, Wilson had generally served in Agency management slightly longer than Murphree: his management position began in 2000 whereas Murphree's began in 2001. Wilson's service in Agency management lists as follows:   he was an Operations Supervisor in Mobile in Alabama from 9/2000 to 7/2003; ADM in Montgomery from 7/2003 to 1/2007; temporary DM in Birmingham from 1/07-4/2/07; and Level 1 DM in Birmingham from 4/07-1/08.  Further, as Buehler noted, the markets that Wilson managed (Mobile, Montgomery, and Birmingham) were larger, busier, and more active markets than the Gadsden market where Murphree worked.

*Selection of Wilson as Alabama DAD and Notification*

As the Area Director, Buehler is considered to be the "Selecting Official" and Rhodes as the Deputy Regional Commissioner is the "Concurring Official," for DM vacancies in her area;

both Buehler and Rhodes are required to consult with Regional Commissioner Barnes when filling positions in his region.  Barnes can vote down their recommendation if he disagrees with it.  Barnes has only voted down a recommendation on one occasion, and on that occasion he voted down the recommended white candidate in favor of an African American candidate because he knew both candidates very well and the African American ultimately selected had done an outstanding job in handling sensitive issues whereas the recommended candidate had not demonstrated any such exceptional abilities.

On December 6, 2007, a day or two after receiving the candidate list for the DAD position, Buehler returned to Barnes's office and, during a meeting with Barnes and Rhodes, she communicated her recommendation of Wilson for the position.  Buehler and Barnes agree that Buehler did not discuss and compare the relative strengths and weaknesses of the four candidates with Barnes and Rhodes, either before or during the meeting, and they did not discuss the race of the candidates, either before or during the meeting.  Although Buehler does not recall providing any justification for her decision, Barnes testified that Buehler did state Wilson's qualities that made him a good choice but did not compare him to anyone else.  Barnes and Rhodes did not question her decision, and after consulting with them, she selected Wilson.

Buehler advised Harris, the acting DAD, of the selection of Wilson, and also called Wilson to confirm that he would accept the position.

*Murphree's Conversation with Harris about Selection*

When Harris learned of Wilson's selection, she called Murphree to let him know of Wilson's selection before a general announcement was made.  In that conference between Murphree and Harris, Murphree was very upset and blamed his failure to get the job on race and

11

his association with Charlie Wofford.  He stated to Harris that the selection was "racially motivated or that there was some racial issues involved" and that "he was not selected because Mr. Barnes wanted somebody that was African American."  He also told her that he was not selected because he was a member of Charlie Wofford's original team "and anything that has to do with Charles Wofford, then I'm not going to be selected."  (Doc. 21-3, at 59-60 & 62).

Harris testified that Agency policy provides that she advise any staff member complaining of racial discrimination to go to the EEO and then to advise her supervisor of the complaint.  However, Harris did not advise Murphree to go to the EEO and did not report this conversation to the EEO as a complaint of racial discrimination.  In this instance, Harris did not feel that Murphree was truly making a complaint of racial discrimination; instead, she testified that she felt that it was a heat-of-the-moment comment made confidentially friend-to-friend, not as co-worker-to-co-worker made in a business capacity, because Murphree was disappointed that he was not selected.  Harris further testified that, during this conversation, Murphree did not ask her to do anything on his behalf.

*Official Announcement and Murphree's Communications with Buehler*

On December 7, 2007, Buehler emailed to Agency personnel an announcement of the selection of Wilson as Alabama DAD within the Agency.  That same day, Murphree sent an email to Buehler expressing his disappointment in her decision, and tried to contact her by phone.  Buehler called Murphree several days later.  In that phone conference, Murphree told Buehler that he believed he was not selected because Barnes did not want him to have the position.  Buehler testified that Murphree told her that he thought Barnes did not like him because of his close association with Wofford.  Murphree remembers the conversation a bit differently, and says

that although he referenced his association with Wofford, Murphree specifically told Buehler in the December phone conversation that the reason he was not selected for the DAD position was "because of my skin color": Murphree told her that "she knew that was the reason, [Murphree] knew that was the reason, everyone knew that was the reason."[5]  (Doc. 21-11, at 24, p. 96). Although Murphree says he did not elaborate on his complaint of race discrimination at the time, the background of his accusation was the prior conversation he had with Buehler in Orlando before Wilson's selection.  Buehler's bottom line advice to Murphree, now that he had expressed his point, was to make the best of the fact that he was not selected and "move on."  Murphree's declaration indicates that her statements discouraged him for proceeding further with his EEO complaint.

### Murphree's EEO Counseling

On March 28, 2008, Murphree sought EEO counseling and filed an EEO complaint. Buehler learned that Murphree had filed an EEO complaint through an email from Rhodes dated April 22, 2008.

### Garrison's Complaint of Sexual Harassment

As discussed previously, during the latter part of 2007, Murphree had received notice of allegations that Garrison had improperly denied a Social Security claim.  The Agency instructed Murphree to conduct a fact-finding interview with Garrison at the Albertville office.  Murphree informed Buehler and James Kemp from the Officer of Labor and Management Relations that he was uncomfortable conducting the interview. One reason he was uncomfortable is that he was

---

[5] Although Murphree's responsive brief states that he demanded that Buehler do something about the racially discriminatory selection, the evidence reflects no such explicit demand.

not Garrison's first-line supervisor, and he asserts that company policy provides that the first-line supervisor always conducts such an interview.  He claims that another reason for his discomfort was his fear that Garrison would retaliate against him. However, his supervisors told him to proceed with the investigation, and he did so on January 17, 2008.  Because of his discomfort and because he expected Garrison to retaliate, he instructed the Albertville management team, DM Melissa Hill and OS Carla Edwards, to observe the interview through a large window that framed the office wall.  Hill and Edwards did so and did not observe any inappropriate behavior on his part during the interview.

On January 23, 2008, Garrison verbally complained to Hill and Edwards that Murphree had subjected her to on-going sexual harassment for five years.  Hill notified Buehler, who arranged to meet with Garrison at the Albertville office.  In that meeting and in a written statement that Garrison submitted to Buehler dated February 1, 2008, Garrison alleged that the sexual harassment had occurred from the time she and Murphree first started working together in May of 2002 through the January 17, 2008 fact-finding interview at the Albertville office.  She described unwelcome sexual advances that Murphree had allegedly made to her as well as ongoing sexually explicit and sexually oriented comments, jokes, stories, and activities at the workplace, some of which he actively participated in and some of which he knew about but took no action.

*Sexual Harassment Investigation*

Buehler reported Garrison's complaint to Deputy Regional Commissioner Rhodes and discussed the matter with Regional Commissioner Barnes.  The Office of the Regional Commissioner assigned a team to investigate Garrison's allegations, and the investigation began

and was completed during the week of February 4, 2008.  Buehler was not on the team and was

not involved in the investigations except to inform the employees of the Gadsden and Albertville

offices that their participation in the investigation was voluntary.  As part of its investigation, the

team interviewed 30 employees in the Gadsden and Albertville offices, including Murphree and

Garrison.

### Investigative Report

The investigative report came out on February 20, 2008, although the Agency did not

give Murphree the result of the investigation until a month later, March 20, 2008.  In the report,

the investigative team stated that it found "no evidence supporting the allegation that [Murphree]

engaged in sexual harassment towards [Garrison].  Furthermore, there is no evidence to support

the allegation that [Murphree] acted inappropriately towards other female employees in the

Gadsden district." (Doc. 21-12, at 12).

However, the team also found that inappropriate behavior occurred at the Gadsden office.

According to the report, Murphree, Teresa Lott, the Gadsden office's Assistant District Manager,

who is Caucasian, and the OS Jacque Allen, who is African American, all acknowledged that

they made off-color remarks and jokes *with each other*, but Murphree insisted that he did not

engage in such conduct *with non-management staff*.

Regarding inappropriate behavior outside the confines of the management circle, the

report noted several incidents.  None of these incidents involved sexual misconduct on the part of

Murphree, but they did involve misconduct on the part of office workers whom he supervised

and managed.  Because Murphree ultimately received disciplinary action for the way he, as office

manager, addressed (or failed to address) this conduct, the court will list some examples of the

office incidents and conduct detailed in the investigative report.

The report referenced a running office joke about a "blow job contest."   According to the report, both Garrison and Lott witnessed Garrison joking around the office that she was "the best" at this sexual act and therefore was "the Queen," offering to give lessons.    Murphree admits to being aware of the standing joke about the "blow job-queen contest," and states that he never specifically inquired about it.  He recalls Garrison approaching him once with a work-related concern that needed his approval and when he refused to approve it, she asked "would a blow job change your answer?"  Murphree replied, "No - it would not," and later spoke with Garrison about the inappropriateness of her remark.  The report indicated that "all members of management in the Gadsden DO stated that [Garrison] has a preoccupation with the topic of sex as they have found this subject to be a constant theme in her daily conversations."  (Doc. 21-12, at 14).

Examples of other incidents listed in the report involved Lott's making jokes of a sexual nature around the office, which Murphree addressed by asking her to "tone it down" and Lott's bringing a sex toy catalog to work, which Murphree addressed by asking her to refrain from such inappropriate conduct.  The evidence reflects Murphree was not aware of the other incidents.

As to these allegations of on-going, inappropriate sexual comments and jokes at the workplace, the investigative team concluded

> that the Gadsden, AL District Office management team (DM, ADM, and OS) did engage in some inappropriate conduct as it relates to the following:
> •     Inappropriate conversations, joking, sexual innuendos with each other;
> •     Allowing staff to engage in inappropriate conversations, jokes (by not addressing the behavior once made known to them, except on some occasions);
> •     Bringing an inappropriate "adult novelty" catalog to the office and allowing

the employee to view it and take it to her desk, and sharing it with another
member of management; and

• Not addressing and documenting conduct issues (i.e., disrespect towards
management, leave abuse by employee and a coworker, inappropriate
language used towards management, etc.).

(Doc. 21-12, at 13-14). The investigatory team made a number of recommendations, including

training for the management team on sensitivity, diversity, employee relations, and sexual

harassment, as well as "any additional corrective actions deemed necessary for the management

staff." *Id.* The team did not recommend that Garrison be disciplined for asserting that Murphree

engaged in conduct that sexually harassed her.

Buehler reviewed the investigative report. According to her affidavit, she noted that the

report found no corroboration of the claim that Murphree sexually harassed Garrison but it did

find "corroboration of [the allegations of] sexually inappropriate conduct and actions that

occurred in the office, where Mr. Murphree was involved in or had knowledge of the comments

or actions." Referring to the "'blow job contest' [joke] that he allowed to continue without

consequence" and "management jok[ing] with each other in a sexually inappropriate manner,"

Buehler stated that she "concluded that Mr. Murphree's response was inadequate and merited

disciplinary action." (Doc. 21-2, at 4-5).

*Discipline of Murphree*

After reviewing the report, Buehler and Wilson agreed at the beginning of April of 2008

that a 2-day suspension of Murphree was appropriate "because there were very inappropriate

comments and jokes of a sexual nature which he participated in, or was aware of and did not

address adequately, or at all." Buehler stated in her affidavit that, in making this decision, she

had no input from Barnes. She also stated that, at the time she made this suspension decision,

she was not aware of Murphree's allegations of discrimination as to the Alabama DAD selection,
but a dispute exists whether Murphree complained of discrimination at the time she and he
discussed over the phone the selection of Wilson in December of 2007.  In addition to the
disciplinary action involving Murphree, Buehler also issued a 1-day suspension to Lott and a
reprimand to Allen for their inappropriate actions. (Doc. 21-2, at 4).

Wilson discussed the disciplinary action with Murphree, and on May 1, 2008, Murphree
provided a written statement and gave an oral presentation, objecting to the suspension.
Murphree submitted evidence, for example, that in certain situations, he sought advice from the
AD's office, received advice that he should "always counsel first" and that he had attempted to
deal with inappropriate behavior by his subordinates in an informal fashion.  For example,
Buehler considered an email from Jeff Brothers in the AD office addressing Murphree's request
for guidance on Garrison's "blow job" comment to him and advising that a verbal reprimand was
appropriate under the circumstances.  Buehler also considered Murphree's "unblemished record"
and the statement from Lott that Murphree verbally reprimanded her after she brought the adult
novelty catalog to work.   At the conclusion of the May 1 meeting, Buehler determined that the
information submitted justified a reduction of the proposed suspension from two days to one and,
Murphree ultimately received a 1-day suspension which occurred on June 12, 2008.

In her deposition testimony, Buehler testified that she believed Murphree, as a Level 1
DM, should be leading by example with Lott and Allen and that he did not do enough to address
the sexually inappropriate jokes and comments of which he was aware in the workplace that he
managed.

18

*No Discipline of Garrison*

After the investigative committee's finding no evidence that Murphree sexually abused Garrison, the Agency did nothing to reopen the tabled disciplinary action against Garrison for her improper denial of a claimant's social security claim nor did it discipline her for asserting the sexual harassment claim against Murphree.

*2008 and 2009 Awards*

Although Murphree had qualified for Recognition of Contribution ("ROC") Awards prior to 2008, and although he received the high 4.3 rating in October of 2007, Buehler decided in late March of 2008 not to give Murphree a ROC award in April of 2008. She based that determination on the investigative team's findings in the 2008 report. Buehler further testified that she would not have given Murphree a 4.3 rating for fiscal year 2007 if she had known about the ongoing issues in the Gadsden office he managed as the investigative team delineated in its 2008 report. Instead, Murphree received a $1,000 Exemplary Contribution or Service Award ("ESCA") which carried with it a lower monetary award than the ROC award.

The other Gadsden office managerial staff members, Lott and Allen, received ROC Awards in 2008 because Murphree recommended them for the award, and Buehler did not override the recommendation of their immediate boss.

Buehler testified that she was not aware that Murphree had filed an EEO complaint on March 28, 2008 until after she made the decision about his performance award; she claims that her first notice of his EEO complaint was on April 22, 2008, when she received an email from Leon Rhodes. That email reads:

Rose Mary
Jeff has filed an EEO complaint.  I have a copy of the Counseling Report.  I will share
a copy of it with you, so that we can discuss some of his allegations.

Please call me when you get a chance. [phone number]
Leon

(Doc. 21-21, at 2).

In 2009, although Murphree received a ROC award, his monetary award was based on a 4.3 rating, and was lower than the ROC award that Lott received, which was based on Murphree's rating her at 5.0.

*Tennessee DAD Position*

In 2008, an opening occurred in the Tennessee DAD position.  Murphree did not apply for the position and claims that the Agency discriminated against him when it did not give him an opportunity to do so.  The last person to hold this position permanently was Caucasian, and after he left to participate in a Leadership Program, three people shared the job duties on a temporary basis: a Caucasian male, a Caucasian female, and Esther Carpenter, an African American female who was a GS-14 Level 1 District Manager in Nashville. On April 14, 2008, the Agency temporarily reassigned Carpenter to the DAD position.  Tennessee AD Clevenger, who is Caucasian, called Barnes and recommended the reassigning of Carpenter as Tennessee DAD on a permanent basis.  She felt strongly that the DAD should be someone from Tennessee who was familiar with the operations of the Disability Determination Service ("DDS") as well as Clevenger's own management style and expectations, and Clevenger and Carpenter had worked together for years.  Barnes agreed with her recommendation, and the two did not discuss Murphree as a candidate for the position.  Clevenger did not issue a solicitation of interest to

select a candidate.  On December 21, 2008, the Agency permanently reassigned Carpenter as Tennessee DAD.

In reassigning Carpenter to the Tennessee DAD position, Clevenger and Barnes did not use the Agency's competitive selection process.  Further, the evidence does not reflect that the Agency solicited interest from GS-14 employees in the region, as part of a competitive or non-competitive process.  Put another way, it did not send an email to GS-14 employees in the region including Tennessee, soliciting interest in a "lateral reassignment" to the Tennessee DAD position, as the Agency had done with the Alabama DAD vacancy.

*Computer Integrity Review*

Because Social Security employees have access to sensitive data for processing claims and resolving entitlement issues, the Agency has instituted a Comprehensive Integrity Review Process ("CIRP"), which is a review to identify potentially fraudulent activity involving Agency employees or the public.  All CIRP alerts must be fully and completely investigated, and supervisors have no discretion to initiate a review once a CIRP alert is received; they must do so.

Murphree was the subject of a CIRP alert called Query Time, triggered because transactions were completed under the PIN assigned to Murphre outside of normal working hours. In the case of Murphree's Query Time CIRP alert, the alert occurred on February 19, 2009 because Murphree had initiated a Customer Service Record Query after 9:00 PM ten days before on February 9, 2009.  The customer's address he queried was outside the servicing area for Murphree's office, and Murphree's time and attendance records did not indicate that he worked after 9:00 PM on February 9.

Both Lott and Murphree contacted Buehler after they learned of the Query Time alert, and

Buehler determined that this alert should be directed to her as the AD.  Because Buehler could not

determine whether Murphree had a valid work reason for the 9:00 PM query, Buehler contacted

Atlanta CSI for guidance, receiving advice that she request Murphree's PIN traffic for February 8-

10, 2008.  Buehler took this advice, requesting his PIN traffic, and Buehler also requested

information from the security alarm system to determine what time Murphree accessed the office.

Neither Buehler nor Barnes submitted a request for permission to covertly monitor Murphree's

computer system or spy on the contents of his hard drive.

Buehler reviewed the information received from CSI and determined that Murphree's

inquiry was conducted after normal working hours.  On February 24, 2009, Buehler contacted

Murphree and requested an explanation.  Murphree explained that February 9, 2009 was the day

before Buehler's annual security review of the Gadsden office, and he was checking the list of

high-risk claimants in preparation for this meeting.  Buehler accepted Murphree's explanation,

then closed the Query Time review with no resulting disciplinary or administrative action.

*Comparator Evidence*

Murphree provides no evidence of an African American DM who fits the following

characteristics:  who was under Buehler and/or Barnes; who was found to have engaged in telling

jokes or comments of a sexual nature with his management team and/or to have failed to

appropriately address staff conduct when staff engaged in sexually inappropriate conduct; but who

was not suspended.

In his deposition, Murphree refers to a double standard regarding regional executives.  He

mentions rumors about an African American regional executive alleged to have had an affair, but

acknowledges that he has no evidence beyond what one retired employee told him when she was

22

not under oath.  However, the disciplinary action against Murphree was not based on his having an inappropriate romantic relationship in the office.

Murphree also testified that the Agency treated differently from himself two named black managers, Patsy Lewis and Jesse Varnado.  Regarding Patsy Lewis, the Agency confirmed that "fraud was going on in her office with time and attendance and with the husband of an employee drawing SSI, and that [Lewis] was aware of it."  (Doc. 21-11, at 55, p. 219).  The evidence reflects that Buehler was not involved in the discipline of Lewis; Wofford was the Alabama AD at the time.  After the problems in Lewis's office came to light, the Agency transferred Lewis laterally out of the DM position to the position of project manager in the AD's office, a position in which she no longer supervised others.  Barnes testified that the Agency decided to give Lewis a non-supervisory position for "a number of issues," including Lewis's inability to deal with inter-personal issues, performance issues, and issues of office morale.  However, in Murphree's opinion, the transfer was a more favorable action than the one-day suspension he received.

The other proposed African American comparator, Jesse Varnado, worked in the office in Jackson, Mississippi, which was not under Buehler's supervision.  Although Murphree understood generally that the situation involved a hostile work environment, he acknowledged that he had never spoken with and did not know the employee reporting the situation and did not know the specific facts; his supervisor at Albertville had merely told him what she heard from an unnamed employee in the Jackson office that Varnado may have been treated more favorably. Barnes testified that the Jackson field office received review because of ongoing performance and work-load issues.

Finally, Murphree proffers as comparators "[t]wo situations in – I think it's Fort

Lauderdale East and Hialeah, where two black managers were caught manipulating the system, if you want to say cheating, even going so far as to write or have software that would generate false work credit." (Doc. 21-11, at 57, p. 223). Ken Chaney, the area director in Georgia, advised Murphree that the Agency never disciplined the Florida African American managers, but Murphree does not know the names of those managers and the record does not reflect that Chaney was in charge of the Florida managers or otherwise had access to the relevant facts. Murphree's discipline set out in the present suit did not involve the same type of misconduct, and the evidence does not reflect that either Buehler or Barnes were supervising the Florida managers.

*Other Alleged Evidence of Discrimination*

Under Management Directive 715, the Agency is required to gather and report its demographic data involving personnel actions. For the last three years, reports under this directive shows Barnes's region as being under-represented in the White male category in some positions. However, Barnes testified that, because the Agency is comprised of about 70% women, not only white males but also black males are under-represented. The report did indeed find that both white *and black* males were under-represented in region IV compared to the Regional Civilian Labor Force and recommend the development of means of increasing not only the pool of qualified white males but also the pool of qualified *black* males. (Doc. 24-8, at 6, 9, & 24). However, the white male force fell below "tolerance level" while the black male force did not. No quota system exists and the instant lawsuit contains no disparate impact claims.

*EEO Proceedings*

As noted previously, on March 28, 2008, Murphree officially contacted an EEO Counselor. On June 24, 2008, Murphree filed a complaint of race discrimination with the

Agency.  On August 15, 2008, the Agency accepted the complaint asserting the following specific

issues: (1) hostile work environment based on race listing the following acts of harassment: the

undermining of his supervisory authority by management; threatening him with disciplinary

action and ridiculing and humiliating him; and overlooking him for promotion and advancement

opportunities; (2)  based on race and reprisal,  he was suspended for one day on June 12, 2008; (3)

based on race and reprisal, he was not given the opportunity to compete for a GS-14 DAD

position (presumably the Tennessee DAD position); (4) based on race and reprisal, his May 2008

award was downgraded from a ROC award to an Exemplary Contribution or Service Award.

(Doc. 21-39, at 2).

    In the August 15 letter, the Agency specified that it did not accept the issue regarding

Murphree's failure to be accepted for the Alabama DAD position in December of 2007, because

this particular complaint failed to comply with the time limits in §§ 1614.105, 16.14.106, and

1614.204(c) in that he did not consult an EEO Counselor until March 28, 2008, which was outside

the 45-day period.  The Agency letter stated that it took into consideration Murphree's explanation

for the untimely contact, but that Murphree did not provide circumstances warranting extension

pursuant to § 1614.105(a) and did not provide "other equitable circumstances that would mitigate

his untimely request for EEO counseling. . . ." (Doc. 21-39, at 5).

    On April 14, 2009, Murphree filed a second complaint of discrimination with the Agency.

On May 11, 2009, the Agency accepted the complaint with the following allegation: "that he was

subjected to reprisal (prior EEO activity), harassment (non-sexual) and a hostile work

environment when on February 19, 2009, he was notified that his local hard drive was flagged for

an []integrity review because of activity deemed to be questionable." (Doc. 21-50).

On November 10, 2010, the Agency entered a Final Order on Murphree's EEO complaints.  Although the briefs do not cite to this Final Order or reflect its provisions, the Complaint states that the Order denied his EEO complaints, that Murphree filed a timely appeal from the Final Order on December 6, 2010, and that the Commission accepted it pursuant to 29 C.F.R. § 1614.405(a).  The Complaint also reflects that on February 15, 2012, the Commission affirmed the Agency's Final Order.

On May 16, 2012, within ninety days of receiving the Agency's Final Order, Murphree filed in this court charges of race discrimination and retaliation against the Agency.

## II. STANDARD OF REVIEW

Summary judgment is an integral part of the Federal Rules of Civil Procedure.  Summary judgment allows a trial court to decide cases when no genuine issues of material fact are present and the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56.  When a district court reviews a motion for summary judgment it must determine two things: (1) whether any genuine issues of material fact exist; and if not, (2) whether the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56).  The moving party can meet this burden by offering evidence showing no dispute of material fact or by showing that the non-moving party's evidence fails to prove an essential element of its case on which it bears the ultimate burden of proof.

*Celotex*, 477 U.S. at 322-23.  Rule 56, however, does not require "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim."  *Id.*

Once the moving party meets its burden of showing the district court that no genuine issues of material fact exist, the burden then shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Disagreement between the parties is not significant unless the disagreement presents a "genuine issue of material fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)   Substantive law determines which facts are material and which are irrelevant.  *Id*. at 248.  In responding to a motion for summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material fact."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

In reviewing the evidence submitted, the court must "view the evidence presented through the prism of the substantive evidentiary burden," to determine whether the nonmoving party presented sufficient evidence on which a jury could reasonably find for the nonmoving party. *Anderson*, 477 U.S. at 254; *Cottle v. Storer Commc'n, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). The court must refrain from weighing the evidence and making credibility determinations, because these decisions fall to the province of the jury.  *See Anderson*, 477 U.S. at 255; *Stewart v. Booker T. Washington Ins. Co.*, 232 F.3d 844, 848 (11th Cir. 2000); *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999).  Furthermore, all evidence and inferences drawn from the underlying facts must be viewed in the light most favorable to the non-moving party. *Graham*, 193 F.3d at 1282.  The non-moving party "need not be given the benefit of every

inference but only of every reasonable inference." *Id.* The evidence of the non-moving party "is to be believed and all justifiable inferences are to be drawn in [its] favor." *Anderson*, 477 U.S. at 255. After both parties have addressed the motion for summary judgment, the court must grant the motion *if* no genuine issues of material fact exist *and if* the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56.

Even if a district court "'believes that the evidence presented by one side is of doubtful veracity, it is not proper to grant summary judgment on the basis of credibility choices.'" *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013) (*quoting Miller v. Harget*, 458 F.3d 1251, 1256 (11th Cir. 2006)). The court should not disregard self-serving statements made in sworn testimony simply because they are self-serving at the summary judgment stage, and if the self-serving statements create a genuine issue of material fact, the court should deny summary judgment on that basis. *Id.* at 1253.

### III.  DISCUSSION

Murphree asserts that his employer discriminated against him because of his race, and also retaliated against him because of his complaints of race discrimination, all in violation of Title VII. The court will address these allegations separately below.

#### A.  Race Discrimination in Failing to Select/Promote

Murphree asserts that the Agency discriminated against him because of race when it failed to select him for the Alabama DAD position and the Tennessee DAD position

##### 1. Timeliness of Alabama DAD claim

The Agency asserts that "[t]he Alabama DAD non-selection claim is untimely because Plaintiff failed to consult with an EEO counselor within 45 days of the alleged discriminatory

event." (D's Reply Br., doc. 31, at 29 (citing 29 C.F.R. § 1614.105(a)(1)).   As a jurisdictional prerequisite to filing a Title VII action, a federal employee must exhaust his administrative remedies.  *Shiver v. Chertoff,* 549 F.3d 1342, 1344 (11th Cir. 2008); 29 C.F.R. § 1614.105(a)(1). To exhaust his remedies, a federal employee must indeed "initiate contact with [an EEOC Counselor] within 45 days of the date of the matter alleged to be discriminatory, or ... within 45 day of the effective date of the action." 29 C.F.R. § 1614.105(a)(1).  "Generally, when the claimant does not initiate contact within the 45-day charging period, the claim is barred for failure to exhaust administrative remedies."  *Shiver,* 549 F.3d at 1344.

In the instant case, Murphree learned of his non-selection for the Alabama DAD position on December 7, 2007, and sought EEO counseling on March 28, 2008.   Because 111 days elapsed  between those dates, the March 28, 2008 counseling date is untimely if that date represents his first EEO counseling.   The court acknowledges being perplexed about Murphree's argument on this issue: he appears to be arguing, on one hand, that he did not consult an EEO Counselor because Buehler threatened him and discouraged him from doing so, but he is also arguing, on the other hand, that he understood Buehler and/or Harris to represent an EEO Counselor. While those arguments, taken together, appear nonsensical, the court will address these arguments as alternative ones, assuming he is presenting the argument that his conversations with Buehler and/or Harris represent initiation of contact with a Counselor, and presenting as well the alternative argument that even though he did not initiate timely contact with a Counselor, equitable tolling should apply.

Murphree first argues that his conversations with Buehler and Harris in December of 2007 represent initiation of contact with a Counselor within the meaning of the regulation quoted

above.  *If* he is correct, these conversations were either contemporaneously with his discovery that Wilson was selected as Alabama DAD or within a few days of that discovery, and thus, his claim would be timely.

As to whether his conversation with Bueler represents initiation of contact with a counselor, the facts show as follows.  Within a week of discovering that an African American employee was selected for the Alabama DAD job in his stead, Murphree testified that he spoke via phone call to Buehler, and complained of race discrimination in that job selection.  As Murphree relates the conversation, Buehler did not specifically respond to the allegations of race discrimination and advised him to accept his non-selection and move on.  Even if this contact suffices as contact with an EEO Counselor, Murphree could not reasonably have misunderstood that statement as the beginning of the EEO process. Murphree does not relate any words in that conversation that would indicate to Buehler that he was treating her as an EEO Counselor, that would indicate to Murphree that Buehler was treating the conversation as initiating EEO contact and would follow up with or relay the complaint to an EEO Counselor, or otherwise to create a misunderstanding on his part that Buehler was acting as an EEO Counselor.

Despite the *argument* in Murphree's responsive brief—which is not *evidence*—that he demanded Buehler do something about the race discrimination, the evidence reflects that Murphree did not specifically demand that Buehler initiate the EEO process or advise him how to do so.  As a DM, Murphree was certainly aware of the EEO process and understood how to initiate EEO contact, and Buehler would have reasonably assumed that he knew how to and could properly initiate EEO contact with an official EEO counselor without her assistance if he so chose; indeed, he eventually did so in March of 2008.

30

Murphree also argues that his communication with Harris in December of 2007 represents initiation of contact with an EEO Counselor.   Harris acknowledges that Murphree complained to her that the selection of Wilson represented race discrimination, but Harris was not an EEO Counselor and testified that Murphree did not ask her to do anything on his behalf regarding the EEO process nor did she offer to do so.  Harris testified that she understood she was listening to Murphree as a friend who was disappointed in not being selected and who was blowing off steam. Although, as Murphree points out, Harris testified that she would normally refer any complaints of discrimination to the EEO office, she also testified that she did not do so in this case because she did not understand the conversation to be a true attempt to initiate the EEO process.  Further, she was not dealing with a person who needed help navigating the EEO process and who was unfamiliar with it; Murphree was a DM trained in the EEO process.  And, in any case, Harris's testimony about what she would normally do as a courtesy to the complainant does not somehow transform her into an EEO Counselor falling within the regulation nor did she make any statements to Murphree that would lead him to believe that she was acting as one.

As support for his argument on this issue, Murphree proffers the Ninth Circuit decision of *Kraus v. Presidio Trust Facilities Div./Residential Mgmt. Branch,* 572 F.3d 1039 (9th Cir. 2009). As that decision states, the EEOC has consistently interpreted 29 C.F.R. § 1614.105 as follows: "a complainant may satisfy the criterion of EEO Counselor contact by initiating contact with any agency official logically connected with the EEO process, even if that official is not an EEO Counselor, and by exhibiting an intent to begin the EEO process."  572 F.3d at 1044 (quoting EEOC Mgmt. Directive 110, at ch. 2, § I.A. n. 1, 1999 WL 33318588 (Nov. 9, 1999)).

In *Kraus,* the plaintiff complained the same day as the alleged discriminatory incident to

31

the company's EEO *officer* but not to the EEO *Counselor*.  In determining that this contact with the EEO officer met the regulation's requirement, the Court of Appeals referenced and deferred to Agency decisions demonstrating that "agency official[s] logically connected with the EEO process" encompassed EEO personnel who held titles like EEO officer as long as they were connected with the EEO process within the Agency.   The Ninth Circuit also explained that "'the purpose of Title VII's exhaustion requirements ... is to provide [the agencies with] an opportunity to reach a voluntary settlement of ... employment discrimination dispute[s] through informal processes before resorting to the formal EEO complaint process." *Kraus,* 572 F.3d at 1045 (quoting *Jasch v. Potter,* 302 F.3d 1092, 1094 (9th Cir. 2002)).  Finding that the EEOC's approach of counting contact with agency officials locally connected with the EEO process (such as the EEO *officer*), even if the official is not the EEO *Counselor,* was pragmatic and consistent with the purpose of Title VII's exhaustion requirement, the Ninth Circuit reversed the district court's grant of summary judgment on the claim.

As well as being non-binding, the *Kraus* decision does not provide strong support for Murphree's position.  Unlike the plaintiff in *Kraus,* Murphree did not complain to an EEO officer. He complained to his supervisor—Buehler, who made the decision—and to Harris—the person temporarily holding the position he wanted—and both Buehler and Harris understood the complaint to be  blowing off steam in disappointment at not being selected rather than initiating an EEO complaint.  They made no promise to relay his complaint to EEO personnel, and Murphree did not specifically ask them to do so.  The court finds the non-binding *Kraus* case to be distinguishable from the instant set of facts.

Murphree also cites an unpublished D.C. Circuit case, not as support but to distinguish his

facts.  *See Acklin v. Natl'l Gallery of Art Bd. of Trustees,* 1986 WL 15790 (D.C. Cir. 1986).

However, Murphree provides no case with analogous facts to support his position, and the court is

aware of none.  Therefore, the court FINDS that neither Buehler nor Harris acted as an EEO

Counselor and neither acted as an agency official logically connected with the EEO process within

the meaning of the regulation.

As another alternative argument, Murphree argues that even if his contacts with Buehler

and/or Harris do not equal "consulting with a Counselor" within the meaning of the regulation,

then the doctrine of equitable tolling should apply and allow him to bring the claim. He points to

Buehler's statement that he should "just let it go" and alleged subsequent retaliatory actions as

misconduct, claiming that these actions justify applying the doctrine of equitable tolling.

The time limit of the regulation in question is indeed "subject to waiver, estoppel and

equitable tolling."  29 C.F.R. § 1614.604(c); *see Zipes v. Trans World Airlines,* 455 U.S. 385, 393

(1982).  However, "[t]he Supreme Court has made clear that tolling is an extraordinary remedy

which should be extended only sparingly." *Justice v. United States,* 6 F.3d 1474, 1479 (11 th Cir.

1993) (citing *Irwin v. Dep't of Veterans Affairs,* 498 U.S. 89, 94-95 (1990)).

As the party arguing that equitable tolling applies, Murphree has the burden of showing

that the equitable remedy is warranted.  *Justice,* 6 F.3d at 1479.   The Supreme Court has

explained the circumstances appropriate for equitable tolling:

> [w]e have allowed equitable tolling in situations where the claimant has actively
> pursued his judicial remedies by filing a defective pleading during the statutory
> period, or where the complainant has been induced or tricked by his adversary's
> misconduct into allowing the filing deadline to pass.  We have generally been much
> less forgiving in receiving late filings where the claimant failed to exercise due
> diligence in preserving his legal rights.  Because the time limits imposed by
> Congress in a suit against the Government involve a waiver of sovereign immunity,

> it is evident that no more favorable tolling doctrine may be employed against the
> Government than is employed in suits between private litigants.

*Irwin,* 498 U.S. at 96 (addressing the untimely filing of a discrimination suit against the

Government after EEOC notification letter).

In the instant case, Murphree provides no evidence that he has actively and diligently

pursued his remedies.  While his testimony and that of Harris do reflect that he complained to

Buehler and Harris of race discrimination, the evidence also reflects that, in those conversations

with Harris nor Buehler, neither supervisor said anything that Murphree could reasonably

understand to be initiating the EEO process.  Further, while Murphree characterizes Buehler's

statements to him as threats in his brief, the evidence—the testimony about the circumstances

and statements made— does not reflect that she threatened him.  He also characterizes Buehler's

conversation with him about his complaint as discouraging him from pursuing his EEO rights,

but the court finds that the evidence presented in the light most favorable to Murphree

nevertheless fails to reveal misconduct or trickery or other conduct on the part of Buehler or

Harris of the nature that would invoke equitable tolling.

Therefore, the court FINDS that Murphree has not met his burden to show that this

extraordinary remedy is warranted.  Murphree was a DM with the knowledge and resources

available to him to pursue his complaint with the EEO office in a timely manner, and he did not

actively and diligently do so as to his complaint of race discrimination regarding the Alabama

DAD position.  The court FINDS that he did not timely exhaust his administrative remedies as to

that claim nor does equitable tolling apply to allow him to bring it tardily; the claim is barred.

Having determined that Murphree has not properly exhausted his administrative remedies

34

as to that claim, the court notes that the Agency raises the exhaustion defense in connection with a motion for summary judgment, not a motion to dismiss.  However, the Eleventh Circuit has explained that because the exhaustion defense "is a matter in abatement and not generally an adjudication on the merits [, it] is not ordinarily the proper subject for a summary judgment; instead it 'should be raised in a motion to dismiss, or be treated as such if raised in a motion for summary judgment.'" *Bryant v. Rich,* 530 F.3d 1368, 1375 (11th Cir. 2008) (addressing the exhaustion requirement under the PLRA, not Title VII) (quoting *Ritza v. Int'l Longshoremen's & Warehousemen's Union,* 837 F.2d 365, 368-69 (9th Cir. 1988)); *see Tillery v. U.S. Dep't of Homeland Sec.,* 402 Fed. Appx 421, 424 (11th Cir. 2010) (unpublished Title VII case applying *Bryant's* reasoning regarding dismissal for failure to exhaust remedies to the Title VII context and rejecting the argument that *Bryant* is applicable only to the PLRA's exhaustion requirement). The court therefore will treat this issue as if it were raised on a motion to dismiss.

In sum, the court FINDS that Murphree did not consult with an EEO counselor within 45 days of learning that the Agency selected Wilson for the Alabama DAD position; therefore, he has not administratively exhausted his claim regarding that incident.  Because the finding that Murphree has not exhausted his administrative remedies is not an adjudication on the merits, the court TREATS the Agency's motion on this claim as if it were a motion to dismiss, FINDS that the motion is due to be GRANTED and that the claim of discrimination based on that incident is due to be DISMISSED WITH PREJUDICE.

2.  Merits of the Claims for Race Discrimination on DAD selections

Murphree asserts that the Agency denied him "promotions" – the Alabama DAD position and the Tennessee DAD position based on race, claiming that he was more qualified than Wilson

35

(the African American employee selected for the Alabama DAD position) and Carpenter (the African American employee selected for the Tennessee DAD position.  The court will discuss the Tennessee DAD selection, and – given that it is already discussing the law applicable to "failure to select/promote" claims – it will also address *as an alternative ruling* the merits of the Alabama DAD claim.

To establish a *prima facie* case for disparate treatment in a race discrimination failure to select/promote/hire case, a plaintiff must show: " (i) he or she belonged to a protected class; (ii) he or she was qualified for and applied for a position that the employer was seeking to fill; (iii) despite qualifications, he or she was rejected; and (iv) the position was filled with an individual outside the protected class." *Vessels v. Atlanta Indep. Sch. Sys.,* 408 F.3d 763, 768 (11th Cir. 2005).

### a. Tennessee DAD

The Agency acknowledges in its brief that Murphree has established a *prima facie* case on the claim for discriminatory failure to select him as the Tennessee DAD.[6] (doc. 19, at 42).  It, therefore, must articulate a legitimate, non-discriminatory reason for selecting Carpenter, an African American employee who was a Tennessee DM at the time.  *See Wilson v. B/E Aerospace,* 376 F.3d 1079, 1087 (11th Cir. 2004).

The Agency articulates the following reasons: Clevenger, the selecting Tennessee AD,

---

[6] Although Murphree did not apply for the Tennessee DAD position, his brief focuses on the Agency's alleged failure to follow its own procedures requiring solicitation of interest and a competitive hiring process.  If Murphree is correct, then the Agency's failure to follow procedures prevented him from applying for the job and should not preclude him from establishing his *prima facie* case.  *See Zimmerman v. Dep't of the Army,* No. 1954494, 1996 WL 159290, at *2 (EEOC April 1, 1996).   In any event, the Agency acknowledges for purposes of the motion for summary judgment that he meets his *prima facie* case.

felt strongly that the DAD should be someone from Tennessee who was familiar with the operations of the Disability Determination Service ("DDS") as well as Clevenger's own management style and expectations, and Clevenger and Carpenter had worked together for years. The court FINDS that the Agency has articulated legitimate, non-discriminatory reasons, and thus, Murphree has the burden to establish that those reasons represent pretext for discrimination.

The Eleventh Circuit has explained that in asserting pretext, a plaintiff "must confront the employer's seemingly legitimate reason for not promoting [him] 'head on and rebut it.' *Kidd v. Mando Am. Corp.,* 731 F.3d 1196, 1206 (11th Cir. 2013) (quoting *Chapman v. AI Transp.,* 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc)). In turn, this court's "inquiry is limited to whether the employer gave an honest explanation of its behavior." *Elrod v. Sears, Roebuck, & Co.,* 939 F.2d 1466, 1470 (11th Cir. 1991).

Murphree attacks Clevenger's reasons for selecting Carpenter by arguing that the Agency's failure to follow its own requirements to fill the position by a competitive process represents evidence of pretext for discrimination. Although this attack does not address the reasons for selecting Carpenter "head-on," the court recognizes that because the Agency did not give Murphree the opportunity to apply for the position, the usual weighing of candidates' qualifications and experience did not occur. Accordingly, the court will address Murphree's argument.

The Agency's procedures provide that the Agency must utilize competitive selection procedures for reassignment of an employee to a position with more promotion potential. Murphree argues that the DAD position has more promotion potential than the DM position from which Carpenter was reassigned, and thus, the Agency's failure to use the competitive selection

process means that the reassignment violated those procedures.  Because, as set out more fully in the fact section, Barnes, Buehler, and Clevinger all testified that the DAD position is the same GS-14 pay grade as the Level 1 DM and does not hold more promotion potential, Murphree must present *evidence*—more than conclusory assertions—to support this position or to create a genuine issue of material fact.

Murphree's evidence is as follows: (1) Barnes knew that Murphree was seeking a DAD job in the Southeast because he had applied unsuccessfully for the Alabama DAD position (filled December 6, 2007); (2) at the time of the selection of the new Tennessee DAD, Barnes was aware that Murphree had filed a pending EEO claim for discrimination based on race;  the DAD job description is listed as "the alter-ego to the Area Director"; (3) two out of the last three Area Directors appointed within Barnes's region were filled by DADs; (4) subsequent to the discovery period, Barnes filled vacant AD positions in Mississippi, South Carolina, and Alabama with candidates who had been in the DAD position prior to their selection; (5) at the creation of the DAD position, the Agency "touted [it] as a succession planning tool and as a training position to create a qualified pool of experienced employees to be ready to fill the void created by the impending retirement of many Area Directors nationwide"  (Doc. 24-7, at 2); (6) a higher number of African Americans have been promoted to DAD during Barnes's tenure using a non-competitive selection process; (7) the Agency did not use a competitive process to select the Tennessee DAD; (8) the Agency did not solicit interest in the Tennessee DAD position from SG-14 pay grade employees, whether in a competitive or non-competitive process.  In short, Murphree's argument is that Barnes knew that highly qualified Caucasian Murphree would be interested in the Tennessee AD job and Barnes wanted an African American candidate to have it

instead, so Barnes violated company policy requiring a competitive selection process (where Murphree would have an opportunity to apply) and hand-selected his own candidate.

This court cannot accept Murphree's evidence as raising a genuine issue of material fact on pretext. His argument is focused on *Barnes*: Barnes's knowledge that Murphree had applied for the Alabama DAD job and had complained about race discrimination; and the higher number of African Americans selected for positions during Barnes's tenure. However, the evidence reflects that Clevenger, a Caucasian, selected Carpenter for the job. The evidence does not reflect that Clevenger knew Murphree was interested in the job or knew Murphree had applied unsuccessfully for the Alabama DAD position. Without that knowledge, Clevenger could not have engaged in some kind of discriminatory plot to prevent him from applying for the Tennessee DAD position. Further, the evidence does not show that Barnes manipulated Clevenger's candidate selection in any way, such as rejecting Caucasian candidates or telegraphing that only African American candidates would be welcomed. Although Murphree attempts to characterize Barnes as the ultimate decision maker, the evidence does not support that characterization. Rather, the evidence simply shows that when Clevenger brought her selection of Carpenter to Barnes, he concurred with that recommendation.

Finally, as to the dispute whether the filling of the DAD position without using a competitive selection process was a violation of the Agency's procedures, the court states that, even assuming *arguendo*—without deciding—that the selection did violate Agency procedures, Murphree has not established pretext. The evidence does not reflect that the Agency had ever gone through the competitive selection process when filling the DAD position with Level 1 DM candidates. So, if Agency personnel were indeed wrong in moving a Level 1 DM to a DAD

position without instituting the competitive selection process, that mistake was not a new one. The evidence certainly did not reflect that the Agency had only begun violating this procedure when Murphree began applying for the DAD positions, and thus, that the Agency began violating the procedure in a discriminatory attempt to prevent Murphree from obtaining the DAD position. Further, the evidence does not specifically establish that Barnes was the only one in the Agency who violated the procedure.

Put another way, even if the Agency's were guilty of violation of a procedure, the violation does not establish pretext or raise an inference of discrimination unless some tie exists between the violation and discrimination.  Here, the evidence does not reflect that the Agency treated the move from Level 1 DM to DAD as one requiring a competitive selection process *before* Murphree applied, and no *evidence* otherwise ties the alleged violation to discrimination.

Therefore, the court FINDS that Murphree has not met his burden of producing evidence raising a genuine issue of material fact that the Agency's proffered legitimate, non-discriminatory reason for not hiring Murphree for the Tennessee DAD position was pretextual.  The Agency's motion for summary judgment is due to be GRANTED as to this discrimination claim based on that position.

### b.  Alabama DAD

As discussed previously, the court found that Murphree has not exhausted his administrative remedies on the Alabama DAD claim.  As an alternative ruling on the merits, however, the court FINDS that *if* he had exhausted them and/or *if* equitable tolling somehow applied, the Agency is nevertheless entitled to summary judgment on the merits for the reasons discussed below.

40

The Agency does not dispute for summary judgment purposes that Murphree has established his *prima facie* case, but proffers non-discriminatory reasons for choosing Wilson, an African-American, over Murphree: including Wilson's "regional presence"; his initiative and his good communication skills; his motivation; her opinion that he did a better job of making a presentation at the Alabama managers' meeting than did Murphree; Wilson's success in addressing an employee relations challenge in the Birmingham office and "turning the ship around" at that office; his superior labor relations experience in working at the three largest offices in Alabama (larger than Murphree's Gadsden office) with the most labor relations challenges.   The court FINDS that the Agency has met its burden to articulate legitimate, non-discriminatory reasons for its choice of Wilson.

Murphree argues that these reasons are pretextual and argues that he was more qualified than Wilson.  To raise pretext successfully in a "failure to select/promote" case, however, a plaintiff may not simply show he was the more qualified candidate.  If that were the case, then this court would be placed in the position of re-weighing qualifications and sitting as "'a super-personnel department'" to re-examine the employer's business judgments and second-guess whether they were fair and appropriate, a role the Eleventh Circuit has rejected as inappropriate. *See Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1092 (11th Cir. 2004) (quoting *Lee v. GTE Fla, Inc.*, 226 F.3d 1249, 1254 (11th Cir. 2001). Rather, this court's role is to determine whether the selection of Wilson over Murphree, unfair or not, wise or not, was *discriminatory,* and so, the court's "inquiry is limited to whether the employer gave an honest explanation of its behavior." *Elrod v. Sears, Roebuck, & Co.,* 939 F.2d 1466, 1470 (11th Cir. 1991).

The Eleventh Circuit has explained the pretext inquiry as follows:

41

To show pretext, the employee must confront the employer's seemingly legitimate reason for not promoting [him] "head on and rebut it." *Chapman [v. AI Transp.,* 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc) ] (citing *Alexander v. Fulton Cntyl, Ga.,* 207 F.3d 1303, 1341 (11th Cir. 20000). The plaintiff 'cannot succeed by simply quarreling with the wisdom of that reason." *Id.* Indeed, "a plaintiff cannot prove pretext by simply arguing or even by showing that [he] was better qualified than the person who received the position [he] coveted." *Springer v. Convergys Customer Mgmt. Grp.,* 509 F.3d 1344, 1349 (11th Cir. 2007) (per curiam) (internal brackets & quotation marks omitted). The plaintiff "must show that the disparities between the successful applicant's and [his] own qualifications were of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff." *Id.* (internal quotation marks omitted.).

*Kidd v. Mando Am. Corp.,* 731 F.3d 1196, 1206 (11th Cir. 2013).

The court cannot accept Murphree's argument about his qualifications being superior to Wilson. As the *Kidd* decision reiterates, the Eleventh Circuit's well-established law prohibits this court from re-weighing qualifications and deciding which candidate an employer *should* have hired. Rather, this court must simply review the qualifications of Wilson and Murphree and determine whether the difference between the two is of "such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff." *Id.*

The court has looked at Murphree's experience and qualification and has looked at Wilson's as well. They are fully set out in the facts and the court will not reiterate them here. The court notes that Murphree's own evaluation of subjective qualities, such as decisiveness and effectiveness as a speaker, which evaluation disagrees with Buehler's, does not create a genuine issue of material fact. The inquiry is not whether Murphree evaluated himself differently than Buehler, whether Murphree was more qualified, or even whether Buehler was wrong in not choosing Murphree. Buehler's reasons for choosing Wilson—including but not limited to the

fact that he had experience in the three largest Alabama Agency offices and had "turned the ship around" in a challenging situation in the Birmingham office—are reasonable, and Murphree has not presented evidence to raise a genuine issue of material fact that these reasons are not honest. His own opinion about his relative merit certainly does not raise such a genuine issue of material fact. The court finds that Murphree has not met his burden of showing that the disparities between Wilson's qualifications and his own were of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen Wilson.

The court notes that Murphree argues that he has presented *direct evidence* of discrimination supporting the Alabama DAD selection, pointing to a conversation about what "Harris told Plaintiff that Buehler had told her (Harris)" about what Barnes had previously said to Buehler. (Pl.'s Br., Doc. ). Because this "evidence" is triple hearsay, it is neither admissible nor capable of being presented in a form that would be admissible; it is not a "fact" for this court's consideration under Rule 56(c). *See* Fed. R. Civ. P. 56(c). The testimonies of Buehler and Barnes do not support this characterization of their conversation. Accordingly, Murphree is incorrect to point to this testimony as establishing direct evidence of discrimination.

Murphree also claims that Buehler's refusal to obtain and consider all relevant and readily available sources of information about the competing candidates—such as personnel files, performance appraisals, statements of interest—was in violation of the competitive selection process and indicates a premeditation to select Wilson. In response, the court first notes that the evidence reflects that the Agency treated this selection as a non-competitive process; the Agency form listing the four candidates characterized the process as "non-competitive." Further, as Buehler was very familiar with both candidates and supervised both of them, her failure to

consider documents fails to raise a genuine issue of material fact that her legitimate reason for hiring Wilson was pretextual.

Finally, the court acknowledges Murphree's argument that Buehler's explanation of the reason she chose Wilson for the Alabama DAD is undermined by her contradictory statement to Earley. However, Murphree mischaracterizes Buehler's statement to Earley. Earley did testify that Buehler told her at some unspecified time that Murphree was a "good fit" for the DAD position and indicated she expected to speak with Barnes about him. Buehler remembers the conversation differently.

Assuming that Buehler did make those statements to Earley, however, her characterization of Murphree as "a good fit" is not the same as saying he is a *better candidate than Wilson*. Earley does not specify the date of the conversation, which could have occurred before Buehler knew that Wilson was also interested in the position. Because more than one candidate can be a "good fit" for a position, and because that statement does not contradict her reasons for determining that Wilson was the better candidate of the two, the court finds that this testimony does not raise a genuine issue of material fact on the issue of pretext.

Accordingly, as an alternative ruling, the court FINDS that the Agency is entitled to summary judgment on the merits of the claim involving the Alabama DAD position.

### B. Race Discrimination - Disparate Treatment/Discipline

Murphree also alleges that the Agency treated him differently in disciplining him more harshly than African American employees. To establish a *prima facie* case in a disparate treatment case, a plaintiff must show that

(1) [he] is a member of a protected class; (2) [he] was subjected to an adverse employment

action; (3) [his] employer treated similarly situated employees outside of [his] protected class more favorable than [he] was treated; and (4) [he] was qualified to do the job. . . . When a plaintiff alleges discriminatory discipline, to determine whether employees are similarly situated, we evaluate "whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways."

*Burke-Fowler v. Orange Cnty., Fla.,* 447 F.3d 1319, 1323 (11th Cir. 2006) (quoting *Maniccia v. Brown,* 171 F.3d 1364, 1368 (11th Cir. 1999)).

The proffered comparator must be "similarly situated in all relevant respects." *Holifield,* 115 F.3d at 1562. Further, the proffered comparator's misconduct should be "nearly identical." *Stone & Webster Const., Inc. v. U.S. Dep't of Labor,* 684 F.3d 1127, 1135 (11th Cir. 2012). In addition, the court must consider whether the decision makers were the same for the comparators' discipline because "differences in treatment by different supervisors or decision makers can seldom be the basis for a viable claim of discrimination." *Silvera v. Orange Cnty. Sch. Bd.,* 244 F.3d 1253, 1261 n. 5 (11th Cir. 2001); *see also Chapter 7 Trustee v. Gate Gourmet, Inc.,* 683 F.3d 1249, 1257 (11th Cir. 2010) (quoting the above language in *Silvera* with approval).

In the instant case, Murphree points to two disciplinary actions as discriminatory: his one-day suspension in June 2008 and the downgrading of his ROC award to a lesser award in May 2008. Buehler and Wilson made the decision to suspend Murphree, and Buehler made the decision to give him a lesser award than the ROC. Murphree has provided comparators; however, as detailed in the fact section of the brief, the comparators' misconduct was not nearly identical to that of Murphree. None involved the discipline of a GS-14 DM who was found to have engaged in jokes or comments of a sexual nature with his management team and/or who was found to allow inappropriate sexual jokes to continue in the office among those he

supervised without invoking discipline.  Further, the decision makers were not Buehler or Wilson.

The court FINDS that Murphree has not provided evidence of a similarly situated comparator disciplined differently by the same decision makers, and thus, he has not established his *prima facie* case on these claims.  The motion for summary judgment is due to be GRANTED as to the disparate discipline claims.

### C.  Hostile Work Environment

Murphree also alleges that the Agency subjected him to a hostile work environment.  The court cannot discern from the Complaint and the responsive brief whether he intends to raise hostile work environment as both a race discrimination claim *and* a retaliation claim, and therefore, will assume that he intends both.  In any event, Murphree points to and the Agency's EEO process accepted the following incidents[7] of alleged harassment: (1) undermining Murphree's supervisory authority by a) failing to discipline Garrison for her improper claims handling, although Murphree recommended that she be disciplined; and b) forcing Murphree to conduct a fact-finding interview with Garrison over his objection that she would retaliate against him and that the first-line supervisor should conduct it; (2) overlooking Murphree for promotion/advancement opportunities when he was a) not selected for the Alabama DAD position and b) not given an opportunity to apply for the Tennessee DAD position; and (3) ridiculing, humiliating and threatening him with disciplinary action, including a) when the

---

[7] Murphree also argues in his brief that Buehler's and Harris's failing to assist him in processing his complaint of race discrimination in the Alabama DAD selection was an incident of harassment making up a hostile work environment.  However, this conduct was not specifically listed as an issue accepted as a Complaint in the Agency's letters of August 15, 2008 and May 11, 2009, and thus would be barred for failure to exhaust.

Agency re-directed the investigation of Garrison's misconduct such that Murphree was

investigated; b) unfairly and harshly disciplining him for the inappropriate conduct of others

(including his suspension and the ROC downgrade); and c) conducting an integrity review.

To establish a *prima facie* case of hostile work environment based on race, brought

pursuant to Title VII, a plaintiff must show

> (1) that he belongs to a protected group; (2) that he has been subject to unwelcome
> harassment; (3) that the harassment must have been based on a protected
> characteristic of the employee . . .; (4) that the harassment was sufficiently severe or
> pervasive to alter the terms and conditions of employment and create a
> discriminatorily abusive working environment; and (5) that the employer is
> responsible for such environment under either a theory of vicarious or of direct
> liability.

*Miller v. Kenworth of Dothan, Inc.,*   277 F.3d 1269, 1275 (11th Cir. 2002).  The Agency

challenges Murphree's ability to establish elements three and four, asserting that the alleged

hostile and harassing acts were not based on his race and were not sufficiently severe or

pervasive to alter the terms and conditions of employment.

The court agrees that Murphree has not presented evidence raising a reasonable inference

that the "harassing" acts were *based on race.*  To the extent that Murphree is attempting to argue

that these alleged acts of harassment were race-based only because they occurred in retaliation

for his complaining of race discrimination, the court will address them under the retaliation

claims. As to the list of harassing acts listed on the previous page, the Agency presents plausible,

non-discriminatory reasons for those actions, none of which was based on race, and Murphree

does not present *evidence* contradicting those reasons or otherwise specifically tying the alleged

harassment to his race.

For example, as to the incidents that Murphree characterized as undermining his

supervisory authority,  Murphree claims that the incidents were race-based but provides no *evidence* tying them to race.  The Agency's explanation for requiring him to conduct the Garrison interview is reasonable and not based on race: when an office employee is accused of claims of misconduct, a sensitive issue, requiring the top management person at the office to conduct the interview makes sense.  Murphree makes the conclusory assertion in his affidavit—with no citation to policy manuals and no examples of past history as support—that Agency policy provides for the first-line supervisor to conduct the interview.

Even if that is a true characterization of the Agency policy, he is the manager of the office and ultimately responsible for what happens at his office; and when allegations arise of serious misconduct at his office and under his watch, requiring the office manager to conduct the investigation instead of the first-line supervisor  is reasonable and does not in and of itself raise an inference of racial harassment.   Such a requirement is reasonable even if normal company policy calls for the first-line supervisor to conduct the investigation, and it is particularly reasonable when the first-line supervisor was a witness that brought the misconduct to light in the first place.  To the extent that Murphree was worried about reprisals from Garrison and allegations of sexual harassment from her, he handled the worry by ensuring that he had witnesses to the interview with Garrison.  In the end, Murphree is complaining of harassment because he was required to take responsibility and manage his office in a difficult situation.   But managing is part of his job title, and he should do his job, instead of whining about harassment.

Further, the explanation for the Agency's failing to discipline Garrison as Murphree recommended is also not tied to race:  given Garrison's complaint against Murphree of sexual harassment, the Agency made the decision that allowing Murphree to discipline Garrison during

48

or after the investigation on that complaint was impolitic.  Whether that decision was right or wrong, the evidence reflects that it was a practical attempt to avoid adding more mud to the legal quagmire often accompanying sexual harassment claims and was not a race-based action.

As to the other incidents that Murphree characterizes as harassment, the court has addressed most of them in the race discrimination sections above, and discussed the lack of evidence tying them to race.  One incident not discussed above was the integrity review; however, that review also has no tie to race when the evidence reflects that Murphree's supervisor received a computer-generated integrity alert, followed her responsibility to investigate the alert, accepted Murphree's explanation regarding his computer use, and did not discipline him as a result.

In short, the court FINDS that Murphree has failed to raise a genuine issue of material fact that the harassment was race-based, and thus, has failed to establish an essential element of his *prima facie* case.  As an alternative ruling, the court also FINDS that Murphree has failed to establish that the harassment was sufficiently severe and pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; thus, Murphree has also failed to establish the fourth element of his *prima facie* case.

The court FINDS that the Defendant's motion for summary judgment is due to be GRANTED on this claim because he has not established his *prima facie* case.

### C. Retaliation

Murphree also argues that the Agency *retaliated* against him for complaining about race discrimination by committing the same list of retaliatory actions of harassment and discipline. Although the court has found that the evidence does not support that the materially adverse

actions were themselves race-based, that determination does not mean that the actions could not be performed in retaliation for complaints of race discrimination  Title VII prohibits an employer from retaliating against an employee who has "opposed any practice made unlawful employment practice by [Title VII], or because he has made a charge ... or participated in any manner in any investigation, proceeding or hearing under [Title VII]."  42 U.S.C. § 2000e-3(a).

To establish a *prima facie* case of retaliation, a plaintiff must show "(1) that [he] engaged in an activity protected under Title VII; (2) [he] suffered a materially adverse action; and (3) there was a causal connection between the protected activity and the adverse action." *Kidd v. Mando Am. Corp.,* 731 F.3d 1196, 1211 (11th Cir. 2013).  If the plaintiff establishes his *prima facie* case, the employer must articulate a legitimate, nonretaliatory reason for the challenged action, and, if it does so, then plaintiff has the burden to establish that the employer's proffered reason for that action was pretext for retaliation. *Pennington v. City of Huntsville,* 261 F.3d 1262, 1266 (11th Cir. 2001).

To show pretext, a plaintiff must demonstrate that the employer's "proffered reason was not the true reason for the employment decision." *Texas Dep't of Cmty. Affairs. v. Burdine,* 450 U.S. 248, 256 (1981).  He must "cast sufficient doubt on the defendant's proffered ... reasons to permit a reasonable factfinder to conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct.'" *Combs v. Plantation Patterns,* 106 F.3d 1519, 1538 (11th Cir. 1997) (quoting *Cooper-Houston v. Southern Ry. Co.,* 37 F.3d 603, 605 (11th Cir. 1994)).  He can do that by demonstrating "'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'" *Combs,* 106 F.3d at 1538

50

(quoting *Sheridan v. E.I. DuPont de Nemours & Co.,* 100 F.3d 1061, 1072 (3rd. Cir. 1996)).

In the instant case, the Agency acknowledges that Murphree engaged in protected conduct and does not dispute that element for summary judgment purposes.  Although the evidence is in dispute, when viewed in the light most favorable to Murphree, it reflects that he complained of race discrimination to both Buehler and Harris shortly after Buehler selected Wilson as the Alabama DAD, in December of 2007.  He also filed an official EEO charge in March of 2008.  Thus, he has established protected conduct for the purposes of the motion for summary judgment.

As to the element of materially adverse action, a plaintiff must show that the action "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Burlington Northern & Santa Fe Ry. Co. v. White,* 584 U.S. 53, 68 (2006) (internal quotation omitted).  In the instant case, Murphree complaints of the following alleged retaliatory conduct: the Agency's  (1) forcing Murphree to conduct a fact-finding interview with Garrison over his objection that she would retaliate against him and that the first-line supervisor instead should conduct it; (2) re-directing the investigation of Garrison's misconduct such that Murphree himself was investigated; (3) harshly and unfairly disciplining Murphree for the inappropriate conduct of his subordinates; (4) reducing Murphree's May 2008 performance award from a ROC to an Exemplary Contribution of Service award, which awarded less money; (5) conducting an integrity review; (6) not instituting a competitive selection process for the Tennessee DAD position so that Murphree had no opportunity to apply; and (7) undermining his authority as manager by not carrying out the discipline against Garrison that he, as her manager, recommended.

The court FINDS that the first, second, fifth, and seventh items on this list do not constitute materially adverse conduct.  As discussed above, requiring Murphree, as the office manager, to conduct a interview of an employee accused of serious misconduct at his office is not a requirement that would have dissuaded a *reasonable* office manager from making or supporting a charge of discrimination.   As to the second item, the evidence reflects that the investigation conducted at the Gadsden office was conducted by an independent group and no evidence suggests that the group was aware of Murphree's protected conduct, so no *reasonable* office manager would see a connection between the two and be dissuaded from making or supporting a charge of discrimination.  For the same reason, no causal connection would exist. As to the fifth item, the evidence reflects that the integrity review was computer generated, that the review was standard procedure, that Buehler accepted Murphree's explanation, and that no discipline occurred as a result; consequently, the review would not have dissuaded a *reasonable* employee from making or supporting a charge of discrimination.

As to the seventh item on the list—failing to discipline Garrison for claims of misconduct—the court notes that this *inaction* on the part of the company could only be materially adverse to the extent that it undermined Murphree's authority as DM.  Because Garrison had moved out of Murphree's office and away from his authority by the time the decision was made to delay and then to table indefinitely Garrison's discipline, the Agency's failure to discipline her would not have undermined his authority as a DM to any significant degree; thus, its inaction would not have dissuaded a *reasonable* employee from making or supporting a charge of discrimination.

To the extent, if any, that Murphree also challenges the Agency's failure to discipline

Garrison for her allegations of sexual harassment against Murphree as a materially adverse action, the court rejects this position.  Murphree points to the investigative report's finding no evidence to support those allegations except Garrison's own testimony, and claims that the report, therefore,  supports his claim that she filed false claims against him.  However, some of her claims involved incidents with no witnesses and, therefore, were "he said/she said" situations; consequently finding a lack of supporting evidence is not the same thing as finding that the sexual harassment did not occur. Under these circumstances, the company's failure to discipline Garrison *for her allegations against Murphree* are reasonable and its inaction would not have dissuaded a *reasonable* employee in Murphree's position from making or supporting a claim of discrimination.

The remaining alleged materially adverse actions are the third, fourth and sixth items on the list:  (3) harshly and unfairly disciplining Murphree for the inappropriate conduct of his subordinates; (4) reducing Murphree's May 2008 performance award from a ROC to an Exemplary Contribution of Service award, which awarded less money; and (6) not instituting a competitive selection process for the Tennessee DAD position so that Murphree had no opportunity to apply.  As to these items, the Agency does not argue that, taken individually and/or collectively, they fail to represent a materially adverse action, and the court FINDS that Murphree has indeed shown that materially adverse actions occurred subsequent to his protected conduct.  However, accepting these items as materially adverse does not end the inquiry.

The remaining element of Murphree's *prima facie* case is showing a causal link between the protected conduct and the materially adverse action.  The Eleventh Circuit case law has explained that to meet the causal link requirement, a plaintiff must only prove that "'the

protected activity and the negative employment action are not completely unrelated.'" *Holifield v. Reno,* 115 F.3d 1555, 1567 (11th Cir. 1997). The Agency argues that the only evidence establishing a causal connection is temporal proximity between the protected conduct and the adverse action; notes Eleventh Circuit law providing that if causality rests on temporal proximity alone, then the "temporal proximity must be very close"; and, finally, asserts that the circumstances of the instant case are not close enough.  (Def.'s Br., doc. 19, at 40 (quoting language from *Clark Cnty. Sch. Dist. v. Breeden,* 532 U.S. 268, 273-74 (2001)).

The evidence reflects that Murphree's first protected conduct occurred in December of 2007 and that he officially consulted an EEO Counselor in March of 2008.  Murphree  received notice shortly thereafter in April of 2008 that he would be disciplined as a result of the investigatory report, a suspension that he considered harsh and that took effect in June of 2008.  Other alleged adverse actions such as the reduced performance award also occurred in 2008.

Although Buehler testified that her first notice of Murphree's protected conduct occurred in late April, *after* at least one of the remaining items proffered as materially adverse actions, a genuine issue of material fact exists that he complained to her of race discrimination in December of 2007, *before* the April discipline.  While several months elapsed between the December complaint and the April discipline, a reasonable argument exists that, given the existence of a formal investigation in the interim, April was the earliest practical opportunity to retaliate against Murphree.  Further, no question exists that Beuhler received notice of Murphree's protected conduct before the reduction of his performance award in May and before the Tennessee DAD selection.

The court sees no viable argument that Murphree has not established the elements,

including a causal connection between the protected conduct and the adverse actions listed above as three, four, and six; thus, the court FINDS that Murphree has met his *prima facie* case as to those adverse actions.  Because Murphree has met his *prima facie* case, the Agency must articulate legitimate, non-discriminatory reasons for the remaining adverse actions, and the court FINDS that it has done so.  Accordingly, Murphree has the burden to meet those proffered reasons head-on and establish that each is pretext for retaliation.  To determine whether Murphree has met his burden, the court will address them separately below.

<u>Harshly and unfairly disciplining Murphree for the inappropriate conduct of his subordinates</u>

The Agency's legitimate, non-discriminatory reason for the discipline is that Buehler and Wilson disciplined Murphree  because the February 20, 2008 investigative report regarding the Gadsden office reflected that Murphree engaged in inappropriate conduct, i.e., that he engaged in inappropriate conversations having sexual content with management team members.  The investigative report also reflected that he, as the office manager, responded inadequately to the Gadsden office employees' sexually-inappropriate conduct at the office.  At the beginning of April of 2008, Buehler agreed to Wilson's proposal that Murphree receive a 2-day suspension, and after Murphree objected, the discipline was reduced to a 1-day suspension that occurred on June 12, 2008.

To establish that this reason for the discipline is pretext for discrimination, Murphree presents evidence that he asked for advice from his supervisor (before Buehler) about how to handle the inappropriate, sexually-charged conduct at the Gadsden office and that he followed the supervisor's advice that he should "always counsel first."  The evidence does indeed reflect

that Murphree discussed the inappropriateness of the sexually-charged conduct with individuals in his office, as his supervisor suggested.  The evidence also reflects that Murphree communicated to Buehler his request for advice and his following of that advice, but that Buehler and Wilson nevertheless disciplined him for doing so.  Thus, Murphree argues that the evidence reflects a disturbing inconsistency: the fact that he is being disciplined by Buehler, the AD, for following the advice of the previous AD raises a genuine issue of material fact as to whether the reason for the discipline was pretext for discrimination.  The court agrees.

ROC Award

Another related materially-adverse action was Buehler's decision not to present Murphree with a ROC award, despite his receiving job ratings commensurate with a ROC award in the Fall of 2007 *prior to his protected conduct.*  The reason for decreasing his award was largely the same reason that Buehler and Wilson decided to suspend Murphree and presents the same problem with inconsistency.

Accordingly, the court FINDS that, as to *both* of these materially adverse actions, Murphree has presented evidence that raises an inference of retaliation and/or raises a genuine issue of material fact as to whether the reason for decreasing his award was pretext for discrimination.

The failure to use competitive process for the Tennessee DAD Position and to give Murphree an opportunity to apply

The Agency's legitimate, non-discriminatory reason for failing to give Murphree an opportunity to apply for the Tennessee DAD position is two-fold: that Clevenger wanted a Tennessee candidate to get the job who was familiar with the area and familiar to her; and that

56

company procedures do not require the position to be filled through a competitive selection process.  Murphree attempts to show pretext by establishing that the company violated its own policies and procedures in not using the competitive selection process to fill the Tennessee DAD position when he says it was required to do so.  Noting that agency policy requires competitive process for the move to a position with greater potential for promotion, Murphree characterizes the position of DAD as having more potential for promotion than the position of DM, and thus, argues that the reassignment of Carpenter violated policy and raises an inference of pretext.  However, as previously discussed, the evidence does not support his conclusory assertion that the position of DAD has more potential for promotion.  In light of the evidence provided, Murphree's own perception alone cannot meet his burden of establishing pretext.

In sum, the court FINDS that the Agency's motion for summary judgment is due to be DENIED as the retaliation claims involving the following materially adverse actions: his suspension in June of 2008 and his failure to receive the 2008 ROC award.  The motion is due to be GRANTED as to all other retaliation claims.

**IV. CONCLUSION**

For the reasons stated above, the court FINDS that the motion for summary judgment is due to be GRANTED in PART and DENIED in PART.  The court will DENY the motion as to the retaliation claims involving Murphree's suspension in June of 2008 and his failure to receive the 2008 ROC award.  The court will GRANT the motion as to all other claims.

The court will enter simultaneously with this Memorandum Opinion a consistent Order.

Dated this 4th day of March, 2014.

KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE