FILED
2014 May-12  PM 04:23
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ALABAMA
# MIDDLE  DIVISION

| | | |
|---|---|---|
| **JEFFREY MURPHREE,** | ] | |
| **Plaintiff,** | ] | |
| | ] | |
| **v.** | ] | |
| | ] | |
| **CAROLYN W. COLVIN,** | ] | **CV-12-BE-1888-M** |
| **COMMISSIONER, SOCIAL SECURITY** | ] | |
| **ADMINISTRATION,** | ] | |
| **Defendant.** | ] | |
| | ] | |
| | ] | |

## AMENDED MEMORANDUM OPINION

This employment discrimination case based on race is before the court on "Defendant's Motion for Summary Judgment"  (doc. 18) with supporting brief (doc. 19) and evidentiary material (doc. 21).  The Plaintiff has filed a response (doc. 24), and the Defendant filed a reply (doc. 31); this matter has received thorough briefing.  This court previously entered a Memorandum Opinion and Order granting in part and denying in part this motion.  Upon granting the "Defendant's Motion for Reconsideration" (doc. 34), the court vacated the Memorandum Opinion and Order on this motion. (Doc. 38 ).   For the reasons stated in this Amended Memorandum Opinion, the court will GRANT the motion for summary judgment in its entirety.

# I.  FACTS[1]

The Plaintiff, Jeff Murphree, a Caucasian, alleges that his employer, the Defendant Social Security Administration ("the Agency"), discriminated and retaliated against him based on his race.

*Murphree's Employment History with the Agency Before 2007 Alabama DAD Selection*

Since August of 2002, Murphree served as a GS-14 District Manager ("DM") for the Agency office located in Gadsden, Alabama.  He has over eighteen years of service with the Agency.  At some point during his employment with the Agency, Murphree worked under then Alabama Area Director ("Alabama AD") Charles Wofford, who is Caucasian, and the two men had a close working relationship.  Beginning in 2007, Murphree's first-line supervisor was Alabama AD Rose Mary Buehler, who is Asian American.  Claudia Harris, who is Caucasian, held the position of Acting Deputy Area Director ("Acting DAD") during part of Murphree's tenure, and she occasionally served as Acting AD in Buehler's absence.  However, Buehler, and not Harris, handled work performance appraisals for district managers, including Murphree.

Before his protected conduct in December of 2008, discussed in detail subsequently, Murphree had received no discipline and had earned annual awards at work, always at the high Recognition of Contribution "ROC" level.  In October of 2007, Buehler rated Murphree's performance for fiscal year 2007, which ended on September 30, 2007, as a 5/5 (Outstanding Contribution) in the categories of "interpersonal skills," "participation," "demonstrates leadership,"

---

[1] The court notes that the Plaintiff's disputes with Defendant's facts are not always presented in a way that the court may verify them.  For example, in Plaintiff's "dispute" for Defendant's fact 13, he cites to PEX 17, pp. 90-92, which does not exist.  The cite cannot be a typo meaning PEX 7, because PEX 7 is less than 20 pages.   The cite cannot be a typo meaning DEX 17, because DEX 17 is a short, five-page document.  In responding to Defendant's facts 14, 15, 19, 20, Plaintiff refers back to his flawed response to 13.

and "manages performance."  She rated him a 3/5 (Successful Contribution) in the categories of

"demonstrates job knowledge" and "achieves business results."  As a result of these ratings, Murphree

received a 4.3/5 overall rating for the year.

Also in October of 2007, the Agency's Operations Supervisor ("OS") at the Gadsden office,

Jacque Allen, who is African American, told Murphree of her belief that Michelle Garrison, a claims

representative who worked out of that office and whose race was not specified in the briefs,

improperly denied a Social Security claim "just to get rid of it."  (Doc. 21-11, at 31 p. 122).

Murphree asked Buehler for her advice about handling this integrity issue, and she advised that he

discuss the matter with labor relations.   Apparently, Murphree got someone in the labor relations area

involved initially but did not follow-up to Buehler's satisfaction.  When the matter had not been

resolved by the end of November of 2007, Buehler asked Lana Turner from her office to ask

Murphree what actions he was taking with labor relations about the Garrison matter.   Buehler also

subsequently spoke directly with Murphree about the matter, encouraging him to be more proactive in

obtaining a timely resolution.  In her deposition testimony, Buehler characterized Murphree's

handling of the Garrison claims matter as showing a lack of initiative. She also questioned whether he

was providing her with full disclosure, because in this incident and others he gave her information in

a piecemeal fashion, requiring her to ask him for more information.  Buehler did not write up

Murphree or discipline him because of this incident.

Eventually, Murphree proposed a short-term suspension of Garrison because of the incident.

During this time frame when Murphree was attempting to address Garrison's misconduct, Garrison

requested and apparently received a transfer from the Gadsden office to the Albertville office, which

Murphree did not manage.  Garrison later accused Murphree of sexual harassment during the five-

year course of working with him, as discussed below.  Regional Commissioner Paul Barnes, who is African American, asked Buehler to delay disciplinary action against Garrison regarding the claim incident until the Agency received the results of the sexual harassment investigation.  Deputy Commissioner Leon Rhodes, who is also African American, subsequently informed Buehler that the disciplinary action against Garrison for wrongfully denying a claim was going to be tabled; he explained to Buehler that a long period of time had elapsed since the original fact-finding interview and that the situation was very sensitive given Garrison's subsequent sexual harassment allegations. Buehler had reservations about the decision to table Garrison's discipline, because if the discipline did not occur she "knew it was a matter of time [] before [Garrison] did something else."  (Doc. 21-5, at 92).  Buehler communicated those reservations to Rhodes, but the discipline was tabled despite Murphree's recommendation and Buehler's reservations about tabling it.

*Selection of the Alabama DAD*

At the time Buehler became the AD for Alabama, no permanent Deputy Area Director existed for the state; as noted previously, Harris, who is Caucasian, was holding the position of Acting DAD because Barnes had received authority to appoint a *temporary* DAD.  However, in 2007, the Agency revised its criteria for this position and, under the revised criteria, Alabama became eligible to select a *permanent* DAD.  During a management meeting in Orlando, Florida, Buehler verbally informed the Alabama DMs that the position had been approved.  In subsequent conversations with Buehler, both Murphree and the person eventually selected for the position, Otto Wilson, who is African American and who served as a GS-14 DM in Birmingham, expressed to Buehler their intent to apply for the position.

According to Murphree, he expressed concern to Buehler at the Orlando meeting that he

4

feared his race and his close association with Charlie Wofford would mean that Barnes would prevent him from obtaining the position.   When Buehler told him she knew nothing about a conflict between Barnes and Wofford, Murphree told her that he understood the two men did not like each other and that a deep and bitter racial conflict existed between the two. (Doc. 21-11, at 52).  Murphree followed up this conversation with more expressions to Buehler of his interest in the Alabama DAD position.

A dispute exists whether Buehler advised Murphree that she would like him to be her DAD and planned to recommend him for the position; Murphree says that she did so and told him to talk to his wife about moving to Birmingham, whereas Buehler testified that she merely encouraged him to apply, an encouragement she gave to every DM who expressed an interest in the DAD position. Murphree also testified that Buehler acknowledged that she would need Paul Barnes to concur with her recommendation of Murphree.

Gail Earley, who was a Management Analyst in the Alabama AD's office in 2007, testified by affidavit that she advised Buehler that Murphree would be a good selection for the DAD position. Earley further stated in her affidavit that Buehler told her that Murphree would be a "good fit" for the DAD and that Buehler intended to talk to Barnes about placing Murphree in that position.  Earley does not state the time frame of her conversation with Murphree, so the facts do not reflect whether this conversation occurred before or after Buehler learned that Wilson would also be a candidate.   In her deposition, Buehler testified that her recollection of the conversation with Earley about Murphree was that Buehler simply thanked Earley for sharing her opinion and did not give Earley any indication of her own choice for the position.

*Noncompetitive Selection Process and the DAD Position Background*

On November 26, 2007, the Agency sent an email to GS-14 employees in Region IV, the

Region including Alabama, soliciting interest in a "lateral reassignment" to the Alabama DAD position with statements of interest due by December 3, 2007.  (Doc. 21-7, at 5-6).  Murphree and Wilson both responded, and their names were included in the list of four candidates provided to Regional Commissioner Barnes and Deputy Regional Commissioner Rhodes, both of whom are African American.  The form listing the four candidates instructed the selecting official that the candidates were eligible for a "noncompetitive assignment."  (Doc. 21-7, at 3).

Murphree and the Agency disagree over whether this lateral reassignment would require the use of competitive procedures.  The Agency policy on reassignments, S335-7, provides "Agencies must use competitive procedures when reassigning career or career conditional employees to position with greater promotion potential than positions previously held on a permanent basis."  (Doc. 21-48).  The crux of the disagreement is whether the DAD position has greater promotion potential than the GS-14 DM position.  The description of the DAD is as follows:

> Serves as full deputy and "alter ego" to the Area Director (PD# 6B399S).  Shares responsibility with the Director in all administrative and operational functions.  In the absence of the Area Director, assumes responsibility for the Area Operations and acts on any and all matters with full authority for commitment on matters within the jurisdiction of the Area Supervisor.

(Doc. 21-47, at 3).

Liz Clevenger, who is an AD in Tennessee, testified that she was part of the national work group that was responsible for the creation of the DAD position.  The work group discussed whether the new DAD position would be considered as a stepping stone to the AD position, or, put another way, whether the work group should structure the DAD position so that the person holding the DAD position would normally move up to the AD when a vacancy occurred there.  A majority of the work group recommended that the DAD position should *not* be considered as a

stepping stone to the AD position and that the incumbent DAD should have *no* entitlement to the AD position when a vacancy arose; rather, the DAD position represented another GS-14 position, and when vacancies occurred in the AD position, all GS-14 position holders would be eligible to be considered, depending on their individual talents and experiences.  Clevenger stated that in certain circumstances a candidate other than the DAD would be a stronger candidate for AD, and that she knew of more than one Level 1 DM in Tennessee whom she would support to move directly from the DM position to an open AD position.  Similarly, Buehler testified that she did not agree with the assertion that a Level 1 DM should have experience as a DAD before being promoted to the position of AD; rather, a Level 1 DM could be promoted straight to the AD position.

Barnes testified that two out of the last three AD positions were filled by DAD personnel. Obviously one of the three did not move up from a DAD position.  The two DAD personnel who were selected for the AD had qualifications and experience outside of their normal DAD duties, including their participation in the national Advanced Leadership Program.

Both the Alabama DAD position and the DM position are GS-14 level positions.  The evidence does not reflect that, prior to the selection of Wilson as Alabama DAD, the Agency performed similar DAD selections on a competitive basis in other states.

### *Candidates for Alabama DAD*

At the Area Director's meeting in Atlanta in early December of 2007, Barnes and Rhodes gave Buehler the list of four candidates and asked her to provide a recommendation regarding who should receive the position. Buehler did not discuss with either of them her recommendation

for the position on the day she received the list or prior to that day.[2]  Buehler ultimately decided

to recommend Wilson for the position.  As the supervisor of both Wilson and Murphree, she was

already familiar with both of those two candidates' backgrounds, as well as their strengths and

weaknesses, and she did not consider the statements of interest that they submitted nor did she

consider the contents of their personnel files.

*Buehler's Testimony Regarding Her Reasons for Choosing Wilson over Murphree*

In her deposition testimony, Buehler provided reasons for her selection of Wilson over

Murphree.  She stated that Wilson had a "regional presence," meaning that he enjoyed a

reputation in the region as a problem-solver with good interpersonal skills and had taught

regional classes with highly complimentary comments from those attending.  According to

Buehler, Wilson also has the following qualities: he is motivated, shows good initiative, has a

good rapport with people and good communication skills, and he did a good job of making a

presentation to Buehler about his district for the Alabama managers' meeting.  Further, Charlie

Wofford, the AD before Buehler, had said very positive things about Wilson, stating that he had

sent Wilson to the Birmingham office to address a number of long-standing employee relations

issues there following the reassignment of the former Birmingham DM, and that Wilson was

---

[2] Although Murphree attempts to dispute whether Buehler discussed with Rhodes and/or
Barnes at this point who should receive the position, the "evidence" cited is hearsay (a
conversation between Murphree and Harris regarding what Buehler told Harris about a previous
conversation between Buehler and Barnes). Buehler and Barnes testified that no such discussion
occurred. Harris testified that Buehler never told her Buehler recommended Murphree to Barnes
for the job and that Buehler never told her anything at all about her conversations with Barnes or
Rhodes about the selection of the Alabama DAD.  Harris also testified that she never told
Murphree that Buehler recommended Murphree, and that she has not seen any emails, faxes, or
letters between Buehler and either Barnes or the Atlanta office concerning the Alabama DAD
position that Wilson filled.

"doing great" and was responsible for "turning the ship around." (Doc. 21-5, at 135-39). Finally, Buehler explained that she selected Wilson because he "had had a great deal of labor relations experience in terms of he worked in the three largest offices in Alabama with the most labor relations problems in the area: the offices in Mobile, Montgomery, and then Birmingham Downtown." (Doc. 21-5, at 161-62).

As to Murphree, Buehler testified that Murphree did not perform as successful of a presentation about his district at the Alabama managers' meeting because his presentation was not completed within the time frame given and he appeared extremely nervous[3]. Buehler explained that Murphree is not decisive[4] and sometimes needs "reassurance and guidance when making a decision that I feel like he should be able to make," so she would not describe him as a problem-solver. While Buehler feels that Murphree has good inter-personal skills, she had some concerns about his ability to deal with tough labor relations issues relating to his ability to successfully deal with unions and relating to his handling of Garrison's misconduct on a claims matter. As already noted, Buehler characterized Muphree's handling the Garrison claims incident as reflecting a lack of initiative and lack of full disclosure. (Doc. 21-5, at 144, 146, 147-

---

[3]Although Murphree states in his own declaration attached to the responsive brief that he "has demonstrated great skill at public speaking and presentations, and has done well and spoken appropriately at all manager's meetings at which he has been asked to speak," his conclusory personal opinion about his own abilities does not create a genuine issue of material fact as to *Buehler's* evaluation of his abilities. *See Guinn v. AstraZeneca Pharm. LP,* 598 F. Supp. 2d 1239, 1242 (M.D. Fla. 2009) (stating that "[c]onclusory allegations, evidence that is not significantly probative, and personal opinions do not suffice to defeat a motion for summary judgment," citing *Johson v. Fleet Fin., Inc.,* 4 F.3d 946, 949 (11th Cir. 1993)).

[4] Although Murphree states in his own declaration attached to the responsive brief that he is a decisive manager, his own conclusory characterization of himself does not create a genuine issue of material fact as to Buehler's evaluation.

48).

*Other Evidence Regarding Qualifications*

The evidence reflects that, at the time of selection, Murphree had been a Level 1 DM for over five years whereas Wilson had served as a Level 1 DM for less than one year.  Murphree also had more longevity with the Agency: he has worked there about sixteen years whereas the evidence set out in the briefs does not reflect how long Wilson was employed by the Agency before his 2000 position as Operations Supervisor at the Mobile Office.  Murphree had also served as a Level II DM in Kentucky prior to his assignment to Gadsden, and had also worked in a development assignment as Level II DM in George in the Atlanta Management Development Program, whereas Wilson had no Level II management experience.  Murphree had mentored management employees throughout his years with the Agency through a Mentors for Managers Program, and was mentoring three Alabama management employees at the time of the selection. He also taught training classes for new employees, and served on promotion panels for DM positions as well as serving on leadership development programs at the regional and national level.  Although Murphree's declaration asserts that "[t]he offices that I have managed have as much or more labor management relations activity and management challenges as those managed or supervised by Wilson," he does not explain how he would have personal knowledge of the activity and management challenges at any office other than where he worked. (Doc. 24-7, at 3).

However, Wilson had generally served in Agency management slightly longer than Murphree: his management position began in 2000 whereas Murphree's began in 2001. Wilson's service in Agency management lists as follows:   he was an Operations Supervisor in Mobile in Alabama from 9/2000 to 7/2003; ADM in Montgomery from 7/2003 to 1/2007;

10

temporary DM in Birmingham from 1/07-4/2/07; and Level 1 DM in Birmingham from 4/07-1/08.  Further, as Buehler noted, the markets that Wilson managed (Mobile, Montgomery, and Birmingham) were larger, busier, and more active markets than the Gadsden market where Murphree worked.

*Selection of Wilson as Alabama DAD and Notification*

As the Area Director, Buehler is considered to be the "Selecting Official" and Rhodes as the Deputy Regional Commissioner is the "Concurring Official," for DM vacancies in her area; both Buehler and Rhodes are required to consult with Regional Commissioner Barnes when filling positions in his region.  Barnes can vote down their recommendation if he disagrees with it.  Barnes has only voted down a recommendation on one occasion, and on that occasion he voted down the recommended white candidate in favor of an African American candidate because he knew both candidates very well and the African American ultimately selected had done an outstanding job in handling sensitive issues whereas the recommended candidate had not demonstrated any such exceptional abilities.

On December 6, 2007, a day or two after receiving the candidate list for the DAD position, Buehler returned to Barnes's office and, during a meeting with Barnes and Rhodes, she communicated her recommendation of Wilson for the position.  Buehler and Barnes agree that Buehler did not discuss and compare the relative strengths and weaknesses of the four candidates with Barnes and Rhodes, either before or during the meeting, and they did not discuss the race of the candidates, either before or during the meeting.  Although Buehler does not recall providing any justification for her decision, Barnes testified that Buehler did state Wilson's qualities that made him a good choice but did not compare him to anyone else.  Barnes and Rhodes did not

question her decision, and after consulting with them, she selected Wilson.

Buehler advised Harris, the acting DAD, of the selection of Wilson, and also called

Wilson to confirm that he would accept the position.

*Murphree's Conversation with Harris about Selection*

When Harris learned of Wilson's selection, she called Murphree to let him know of

Wilson's selection before a general announcement was made.  In that conference between

Murphree and Harris, Murphree was very upset and blamed his failure to get the job on race and

his association with Charlie Wofford.  He stated to Harris that the selection was "racially

motivated or that there was some racial issues involved" and that "he was not selected because

Mr. Barnes wanted somebody that was African American."  He also told her that he was not

selected because he was a member of Charlie Wofford's original team "and anything that has to

do with Charles Wofford, then I'm not going to be selected."  (Doc. 21-3, at 59-60 & 62).

Harris testified that Agency policy provides that she advise any staff member complaining

of racial discrimination to go to the EEO and then to advise her supervisor of the complaint.

However, Harris did not advise Murphree to go to the EEO and did not report this conversation

to the EEO as a complaint of racial discrimination.  In this instance, Harris did not feel that

Murphree was truly making a complaint of racial discrimination; instead, she testified that she

felt that it was a heat-of-the-moment comment made confidentially friend-to-friend, not as co-

worker-to-co-worker made in a business capacity, because Murphree was disappointed that he

was not selected.  Harris further testified that, during this conversation, Murphree did not ask her

to do anything on his behalf.

12

*Official Announcement and Murphree's Communications with Buehler*

On December 7, 2007, Buehler emailed to Agency personnel an announcement of the selection of Wilson as Alabama DAD within the Agency.  That same day, Murphree sent an email to Buehler expressing his disappointment in her decision, and tried to contact her by phone. Buehler called Murphree several days later.  In that phone conference, Murphree told Buehler that he believed he was not selected because Barnes did not want him to have the position. Buehler testified that Murphree told her that he thought Barnes did not like him because of his close association with Wofford.  Murphree remembers the conversation a bit differently, and says that although he referenced his association with Wofford, Murphree specifically told Buehler in the December phone conversation that the reason he was not selected for the DAD position was "because of my skin color": Murphree told her that "she knew that was the reason, [Murphree] knew that was the reason, everyone knew that was the reason."[5]  (Doc. 21-11, at 24, p. 96). Although Murphree says he did not elaborate on his complaint of race discrimination at the time, the background of his accusation was the prior conversation he had with Buehler in Orlando before Wilson's selection.  Buehler's bottom line advice to Murphree, now that he had expressed his point, was to make the best of the fact that he was not selected and "move on."  Murphree's declaration indicates that her statements discouraged him for proceeding further with his EEO complaint.

*Murphree's EEO Counseling*

On March 28, 2008, Murphree sought EEO counseling and filed an EEO complaint.

---

[5] Although Murphree's responsive brief states that he demanded that Buehler do something about the racially discriminatory selection, the evidence reflects no such explicit demand.

Buehler learned that Murphree had filed an EEO complaint through an email from Rhodes dated April 22, 2008.

*Garrison's Complaint of Sexual Harassment*

As discussed previously, during the latter part of 2007, Murphree had received notice of allegations that Garrison had improperly denied a Social Security claim.  The Agency instructed Murphree to conduct a fact-finding interview with Garrison at the Albertville office.  Murphree informed Buehler and James Kemp from the Officer of Labor and Management Relations that he was uncomfortable conducting the interview. One reason he was uncomfortable is that he was not Garrison's first-line supervisor, and he asserts that company policy provides that the first-line supervisor always conducts such an interview.  He claims that another reason for his discomfort was his fear that Garrison would retaliate against him. However, his supervisors told him to proceed with the investigation, and he did so on January 17, 2008.  Because of his discomfort and because he expected Garrison to retaliate, he instructed the Albertville management team, DM Melissa Hill and OS Carla Edwards, to observe the interview through a large window that framed the office wall.  Hill and Edwards did so and did not observe any inappropriate behavior on his part during the interview.

On January 23, 2008, Garrison verbally complained to Hill and Edwards that Murphree had subjected her to on-going sexual harassment for five years.  Hill notified Buehler, who arranged to meet with Garrison at the Albertville office.  In that meeting and in a written statement that Garrison submitted to Buehler dated February 1, 2008, Garrison alleged that the sexual harassment had occurred from the time she and Murphree first started working together in May of 2002 through the January 17, 2008 fact-finding interview at the Albertville office.  She

14

described unwelcome sexual advances that Murphree had allegedly made to her as well as ongoing sexually explicit and sexually oriented comments, jokes, stories, and activities at the workplace, some of which he actively participated in and some of which he knew about but took no action.

*Sexual Harassment Investigation*

Buehler reported Garrison's complaint to Deputy Regional Commissioner Rhodes and discussed the matter with Regional Commissioner Barnes.  The Office of the Regional Commissioner assigned a team to investigate Garrison's allegations, and the investigation began and was completed during the week of February 4, 2008.  Buehler was not on the team and was not involved in the investigations except to inform the employees of the Gadsden and Albertville offices that their participation in the investigation was voluntary.  As part of its investigation, the team interviewed 30 employees in the Gadsden and Albertville offices, including Murphree and Garrison.

*Investigative Report*

The investigative report came out on February 20, 2008, although the Agency did not give Murphree the result of the investigation until a month later, March 20, 2008.  In the report, the investigative team stated that it found "no evidence supporting the allegation that [Murphree] engaged in sexual harassment towards [Garrison].  Furthermore, there is no evidence to support the allegation that [Murphree] acted inappropriately towards other female employees in the Gadsden district." (Doc. 21-12, at 12).

Yet, the team also found that inappropriate behavior occurred at the Gadsden office. According to the report, Murphree, Teresa Lott, the Gadsden office's Assistant District Manager,

who is Caucasian, and the OS Jacque Allen, who is African American, all acknowledged that they made off-color remarks and jokes *with each other.*  In his interview with the investigative team, Murphree "admits that he has on occasion engaged in making inappropriate comments and jokes with his ADM and OS . . . . However, he did not think [non-management] employees overheard any of the conversations between him and his management team."  (Doc. 21-12, at 9, 13).  In his deposition testimony, Murphree, while acknowledging that Lott and Allen made off-color remarks among the management team, denied that he ever made sexually inappropriate comments himself.  He also insisted that he did not engage in such conduct *with non-management staff.*  (Doc. 21-11, at 39-41, pp. 152-58).   However, in explaining her decision to discipline Murphree, Buehler explained that the discipline did not turn on whether Murphree told off-color jokes himself; the discipline was "more about that ... he wasn't leading by example with Jacque [Allen]  and Teresa [Lott], and that he didn't do enough to address their jokes and comments and situations. . . [and] because he's the Level I manager.  He's supposed to set the example, be the person that develops the other management folks."  (Doc. 21-6, at 55-56 & 64 pp. 229-230 &

Regarding inappropriate behavior outside the confines of the management circle, the report noted several incidents.  None of these incidents involved sexual misconduct on the part of Murphree, but they did involve misconduct on the part of office workers whom he supervised and managed.  Because Murphree ultimately received disciplinary action for the way he, as office manager, addressed (or failed to address) this conduct, the court will list some examples of the office incidents and conduct detailed in the investigative report.

The report referenced a running office joke about a "blow job contest."   According to the

report, Lott witnessed Garrison joking around the office with other employees that Garrison was

"the best" at this sexual act and therefore was "the Queen," offering to give lessons with a banana

as a prop.  Allen also confirmed this office joke and indicated that she "often" heard Garrison

and other female employees arguing about who was the best at this sexual act.  Garrison told the

investigative committee that this office joke continued for several days.  Murphree admits to

Lott's advising him of the standing joke about the "blow job-queen contest," although he did not

hear the full details until the investigation into Garrison's sexual harassment allegations.  In his

deposition testimony, Murphree acknowledged that he did not directly approach Garrison and

any other employee participating in the joke and did not himself  counsel them, give them a

verbal reprimand, or initiate any other disciplinary action.   Rather, he dealt with this conduct by

telling Lott that such joking was inappropriate and that if it happened in the future, she needed to

stop it.  However, he did not order Lott to counsel or discipline the employees involved in the

joke for conduct that had already occurred. (Doc. 21-11, at 35-36,  pp. 135-38).

Murphree recalls Garrison approaching him once with a work-related concern that needed

his approval and when he refused to approve it, she asked "would a blow job change your

answer?"  Murphree replied, "No - it would not," and later spoke with Garrison about the

inappropriateness of her remark.  The report indicated that "all members of  management in the

Gadsden DO stated that [Garrison] has a preoccupation with the topic of sex as they have found

this subject to be a constant theme in her daily conversations."  (Doc. 21-12, at 14).

Examples of other incidents listed in the report involved Lott's making jokes of a sexual

nature around the office, which Murphree addressed by asking her to "tone it down" and Lott's

bringing a sex toy catalog to work, which Murphree addressed by asking her to refrain from such

17

inappropriate conduct.  The evidence reflects Murphree was not aware of the other incidents

involving sexual jokes or sexual misconduct at the office.

As to these allegations of on-going, inappropriate sexual comments and jokes at the

workplace, the investigative team concluded

> that the Gadsden, AL District Office management team (DM, ADM, and OS) did
> engage in some inappropriate conduct as it relates to the following:
> •     Inappropriate conversations, joking, sexual innuendos with each other;
> •     Allowing staff to engage in inappropriate conversations, jokes (by not
>       addressing the behavior once made known to them, except on some
>       occasions);
> •     Bringing an inappropriate "adult novelty" catalog to the office and allowing
>       the employee to view it and take it to her desk, and sharing it with another
>       member of management; and
> •     Not addressing and documenting conduct issues (i.e., disrespect towards
>       management, leave abuse by employee and a coworker, inappropriate
>       language used towards management, etc.).

(Doc. 21-12, at 13-14).  The investigatory team made a number of recommendations, including

training for the management team on sensitivity, diversity, employee relations, and sexual

harassment, as well as "any additional corrective actions deemed necessary for the management

staff." *Id.* The team did not recommend that Garrison be disciplined for asserting that Murphree

engaged in conduct that sexually harassed her.

Buehler reviewed the investigative report.  According to her affidavit, she noted that the

report found no corroboration of the claim that Murphree sexually harassed Garrison but it did

find "corroboration of [the allegations of] sexually inappropriate conduct and actions that

occurred in the office, where Mr. Murphree was involved in or had knowledge of the comments

or actions."  Referring to the "'blow job contest' [joke]  that he allowed to continue without

consequence" and "management jok[ing] with each other in a sexually inappropriate manner,"

18

Buehler stated that she "concluded that Mr. Murphree's response was inadequate and merited disciplinary action." (Doc. 21-2, at 4-5).

*Discipline of Murphree*

After reviewing the report, Buehler and Wilson agreed at the beginning of April of 2008 that a 2-day suspension of Murphree was appropriate "because there were very inappropriate comments and jokes of a sexual nature which he participated in, or was aware of and did not address adequately, or at all."   Buehler stated in her affidavit that, in making this decision, she had no input from Barnes.  She also stated that, at the time she made this suspension decision, she was not aware of Murphree's allegations of discrimination as to the Alabama DAD selection, but a dispute exists whether Murphree complained of discrimination at the time she and he discussed over the phone the selection of Wilson in December of 2007.  In addition to the disciplinary action involving Murphree, Buehler also issued a 1-day suspension to Lott and a reprimand to Allen for their inappropriate actions. (Doc. 21-2, at 4).

Wilson discussed the disciplinary action with Murphree, and on May 1, 2008, Murphree provided a written statement and gave an oral presentation, objecting to the suspension. Murphree submitted evidence, for example, that in certain situations, he sought advice from the AD's office, received advice that he should "always counsel first" and that he had attempted to deal with inappropriate behavior by his subordinates in an informal fashion.  For example, Buehler considered an email from Jeff Brothers in the AD office addressing Murphree's request for guidance on Garrison's "blow job" comment to him and advising that a verbal reprimand was appropriate under the circumstances.  Buehler also considered Murphree's "unblemished record" and the statement from Lott that Murphree verbally reprimanded her after she brought the adult

novelty catalog to work.   At the conclusion of the May 1 meeting, Buehler determined that the information submitted justified a reduction of the proposed suspension from two days to one and, Murphree ultimately received a 1-day suspension which occurred on June 12, 2008.

In her deposition testimony, Buehler testified that she believed Murphree, as a Level 1 DM, should be leading by example with Lott and Allen and that he did not do enough to address the sexually inappropriate jokes and comments of which he was aware in the workplace that he managed.

### No Discipline of Garrison

After the investigative committee's finding no evidence that Murphree sexually abused Garrison, the Agency did nothing to reopen the tabled disciplinary action against Garrison for her improper denial of a claimant's social security claim nor did it discipline her for asserting the sexual harassment claim against Murphree.

### 2008 and 2009 Awards

Although Murphree had qualified for Recognition of Contribution ("ROC") Awards prior to 2008, and although he received the high 4.3 rating in October of 2007, Buehler decided in late March of 2008 not to give Murphree a ROC award in April of 2008.  Employees with job ratings between a 4.0 and 5.0 were eligible for a ROC award but not guaranteed to receive it.  Buehler based the award determination on the investigative team's findings in the 2008 report. Buehler further testified that she would not have given Murphree a 4.3 rating for fiscal year 2007 if she had known about the ongoing issues in the Gadsden office he managed, as the investigative team delineated in its 2008 report.   Instead, Murphree received a $1,000 Exemplary Contribution or Service Award ("ESCA") which carried with it a lower monetary award than the ROC award.

The other Gadsden office managerial staff members, Lott and Allen, received ROC Awards in 2008 because Murphree, as their immediate supervisor, recommended them for the award, and Buehler did not override the recommendation of their immediate supervisor.

Buehler testified that she was not aware that Murphree had filed an EEO complaint on March 28, 2008 until after she made the decision about his performance award; she claims that her first notice of his EEO complaint was on April 22, 2008, when she received an email from Leon Rhodes.  That email reads:

> Rose Mary
> Jeff has filed an EEO complaint.  I have a copy of the Counseling Report.  I will share a copy of it with you, so that we can discuss some of his allegations.
>
> Please call me when you get a chance. [phone number]
> Leon

(Doc. 21-21, at 2).

In 2009, although Murphree received a ROC award, his monetary award was based on a 4.3 rating, and was lower than the ROC award that Lott received, which was based on Murphree's rating her at 5.0.

*Tennessee DAD Position*

In 2008, an opening occurred in the Tennessee DAD position.  Murphree did not apply for the position and claims that the Agency discriminated against him when it did not give him an opportunity to do so.  The last person to hold this position permanently was Caucasian, and after he left to participate in a Leadership Program, three people shared the job duties on a temporary basis: a Caucasian male, a Caucasian female, and Esther Carpenter, an African American female who was a GS-14 Level 1 District Manager in Nashville. On April 14, 2008, the Agency

21

temporarily reassigned Carpenter to the DAD position.  Tennessee AD Clevenger, who is
Caucasian, called Barnes and recommended the reassigning of Carpenter as Tennessee DAD on a
permanent basis.  She felt strongly that the DAD should be someone from Tennessee who was
familiar with the operations of the Disability Determination Service ("DDS") as well as
Clevenger's own management style and expectations, and Clevenger and Carpenter had worked
together for years.  Barnes agreed with her recommendation, and the two did not discuss
Murphree as a candidate for the position.  Clevenger did not issue a solicitation of interest to
select a candidate.  On December 21, 2008, the Agency permanently reassigned Carpenter as
Tennessee DAD.

> In reassigning Carpenter to the Tennessee DAD position, Clevenger and Barnes did not
use the Agency's competitive selection process.  Further, the evidence does not reflect that the
Agency solicited interest from GS-14 employees in the region, as part of a competitive or non-
competitive process.  Put another way, it did not send an email to GS-14 employees in the region
including Tennessee, soliciting interest in a "lateral reassignment" to the Tennessee DAD
position, as the Agency had done with the Alabama DAD vacancy.

> *Computer Integrity Review*

> Because Social Security employees have access to sensitive data for processing claims and
resolving entitlement issues, the Agency has instituted a Comprehensive Integrity Review Process
("CIRP"), which is a review to identify potentially fraudulent activity involving Agency
employees or the public.  All CIRP alerts must be fully and completely investigated, and
supervisors have no discretion to initiate a review once a CIRP alert is received; they must do so.

> Murphree was the subject of a CIRP alert called Query Time, triggered because

transactions were completed under the PIN assigned to Murphre outside of normal working hours. In the case of Murphree's Query Time CIRP alert, the alert occurred on February 19, 2009 because Murphree had initiated a Customer Service Record Query after 9:00 PM ten days before on February 9, 2009.  The customer's address he queried was outside the servicing area for Murphree's office, and Murphree's time and attendance records did not indicate that he worked after 9:00 PM on February 9.

Both Lott and Murphree contacted Buehler after they learned of the Query Time alert, and Buehler determined that this alert should be directed to her as the AD.  Because Buehler could not determine whether Murphree had a valid work reason for the 9:00 PM query, Buehler contacted Atlanta CSI for guidance, receiving advice that she request Murphree's PIN traffic for February 8-10, 2008.  Buehler took this advice, requesting his PIN traffic, and Buehler also requested information from the security alarm system to determine what time Murphree accessed the office. Neither Buehler nor Barnes submitted a request for permission to covertly monitor Murphree's computer system or spy on the contents of his hard drive.

Buehler reviewed the information received from CSI and determined that Murphree's inquiry was conducted after normal working hours.  On February 24, 2009, Buehler contacted Murphree and requested an explanation.  Murphree explained that February 9, 2009 was the day before Buehler's annual security review of the Gadsden office, and he was checking the list of high-risk claimants in preparation for this meeting.  Buehler accepted Murphree's explanation, then closed the Query Time review with no resulting disciplinary or administrative action.

*Comparator Evidence*

Murphree provides no evidence of an African American DM who fits the following

characteristics:  who was under Buehler and/or Barnes; who was found to have engaged in telling jokes or comments of a sexual nature with his management team and/or to have failed to appropriately address staff conduct when staff engaged in sexually inappropriate conduct; but who was not suspended.

In his deposition, Murphree refers to a double standard regarding regional executives.  He mentions rumors about an African American regional executive alleged to have had an affair, but acknowledges that he has no evidence beyond what one retired employee told him when she was not under oath.  However, the disciplinary action against Murphree was not based on his having an inappropriate romantic relationship in the office.

Murphree also testified that the Agency treated differently from himself two named black managers, Patsy Lewis and Jesse Varnado.  Regarding Patsy Lewis, the Agency confirmed that "fraud was going on in her office with time and attendance and with the husband of an employee drawing SSI, and that [Lewis] was aware of it."  (Doc. 21-11, at 55, p. 219).  The evidence reflects that Buehler was not involved in the discipline of Lewis; Wofford was the Alabama AD at the time.  After the problems in Lewis's office came to light, the Agency transferred Lewis laterally out of the DM position to the position of project manager in the AD's office, a position in which she no longer supervised others.  Barnes testified that the Agency decided to give Lewis a non-supervisory position for "a number of issues," including Lewis's inability to deal with inter-personal issues, performance issues, and issues of office morale.  However, in Murphree's opinion, the transfer was a more favorable action than the one-day suspension he received.

The other proposed African American comparator, Jesse Varnado, worked in the office in Jackson, Mississippi, which was not under Buehler's supervision.  Although Murphree

24

understood generally that the situation involved a hostile work environment, he acknowledged that he had never spoken with and did not know the employee reporting the situation and did not know the specific facts; his supervisor at Albertville had merely told him what she heard from an unnamed employee in the Jackson office that Varnado may have been treated more favorably. Barnes testified that the Jackson field office received review because of ongoing performance and work-load issues.

Finally, Murphree proffers as comparators "[t]wo situations in – I think it's Fort Lauderdale East and Hialeah, where two black managers were caught manipulating the system, if you want to say cheating, even going so far as to write or have software that would generate false work credit." (Doc. 21-11, at 57, p. 223).  Ken Chaney, the area director in Georgia, advised Murphree that the Agency never disciplined the Florida African American managers, but Murphree does not know the names of those managers and the record does not reflect that Chaney was in charge of the Florida managers or otherwise had access to the relevant facts.  Murphree's discipline set out in the present suit did not involve the same type of misconduct, and the evidence does not reflect that either Buehler or Barnes were supervising the Florida managers.

*Other Alleged Evidence of Discrimination*

Under Management Directive 715, the Agency is required to gather and report its demographic data involving personnel actions.  For the last three years, reports under this directive shows Barnes's region as being under-represented in the White male category in some positions.  However, Barnes testified that, because the Agency is comprised of about 70% women, not only white males but also black males are under-represented.  The report did indeed find that both white *and black* males were under-represented in region IV compared to the Regional

25

Civilian Labor Force and recommend the development of means of increasing not only the pool of

qualified white males but also the pool of qualified *black* males. (Doc. 24-8, at 6, 9, & 24).

However, the white male force fell below "tolerance level" while the black male force did not.

No quota system exists and the instant lawsuit contains no disparate impact claims.

*EEO Proceedings*

As noted previously, on March 28, 2008, Murphree officially contacted an EEO

Counselor.  On June 24, 2008, Murphree filed a complaint of race discrimination with the

Agency.  On August 15, 2008, the Agency accepted the complaint asserting the following specific

issues: (1) hostile work environment based on race listing the following acts of harassment: the

undermining of his supervisory authority by management*;* threatening him with disciplinary

action and ridiculing and humiliating him; and overlooking him for promotion and advancement

opportunities; (2)  based on race and reprisal,  he was suspended for one day on June 12, 2008; (3)

based on race and reprisal, he was not given the opportunity to compete for a GS-14 DAD

position (presumably the Tennessee DAD position); (4) based on race and reprisal, his May 2008

award was downgraded from a ROC award to an Exemplary Contribution or Service Award.

(Doc. 21-39, at 2).

In the August 15 letter, the Agency specified that it did not accept the issue regarding

Murphree's failure to be accepted for the Alabama DAD position in December of 2007, because

this particular complaint failed to comply with the time limits in §§ 1614.105, 16.14.106, and

1614.204(c) in that he did not consult an EEO Counselor until March 28, 2008, which was outside

the 45-day period.  The Agency letter stated that it took into consideration Murphree's explanation

for the untimely contact, but that Murphree did not provide circumstances warranting extension

26

pursuant to § 1614.105(a) and did not provide "other equitable circumstances that would mitigate his untimely request for EEO counseling. . . ." (Doc. 21-39, at 5).

On April 14, 2009, Murphree filed a second complaint of discrimination with the Agency. On May 11, 2009, the Agency accepted the complaint with the following allegation: "that he was subjected to reprisal (prior EEO activity), harassment (non-sexual) and a hostile work environment when on February 19, 2009, he was notified that his local hard drive was flagged for an []integrity review because of activity deemed to be questionable." (Doc. 21-50).

On November 10, 2010, the Agency entered a Final Order on Murphree's EEO complaints. Although the briefs do not cite to this Final Order or reflect its provisions, the Complaint states that the Order denied his EEO complaints, that Murphree filed a timely appeal from the Final Order on December 6, 2010, and that the Commission accepted it pursuant to 29 C.F.R. § 1614.405(a). The Complaint also reflects that on February 15, 2012, the Commission affirmed the Agency's Final Order.

On May 16, 2012, within ninety days of receiving the Agency's Final Order, Murphree filed in this court charges of race discrimination and retaliation against the Agency.

## II. STANDARD OF REVIEW

Summary judgment is an integral part of the Federal Rules of Civil Procedure. Summary judgment allows a trial court to decide cases when no genuine issues of material fact are present and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56. When a district court reviews a motion for summary judgment it must determine two things: (1) whether any genuine issues of material fact exist; and if not, (2) whether the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).

27

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56). The moving party can meet this burden by offering evidence showing no dispute of material fact or by showing that the non-moving party's evidence fails to prove an essential element of its case on which it bears the ultimate burden of proof. *Celotex*, 477 U.S. at 322-23. Rule 56, however, does not require "that the moving party support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.*

Once the moving party meets its burden of showing the district court that no genuine issues of material fact exist, the burden then shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Disagreement between the parties is not significant unless the disagreement presents a "genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)  Substantive law determines which facts are material and which are irrelevant. *Id.* at 248. In responding to a motion for summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material fact." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

In reviewing the evidence submitted, the court must "view the evidence presented through the prism of the substantive evidentiary burden," to determine whether the nonmoving party presented sufficient evidence on which a jury could reasonably find for the nonmoving party.

28

*Anderson*, 477 U.S. at 254; *Cottle v. Storer Commc'n, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). The court must refrain from weighing the evidence and making credibility determinations, because these decisions fall to the province of the jury.  *See Anderson*, 477 U.S. at 255; *Stewart v. Booker T. Washington Ins. Co.*, 232 F.3d 844, 848 (11th Cir. 2000); *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999).  Furthermore, all evidence and inferences drawn from the underlying facts must be viewed in the light most favorable to the non-moving party. *Graham*, 193 F.3d at 1282.  The non-moving party "need not be given the benefit of every inference but only of every reasonable inference."  *Id.*  The evidence of the non-moving party "is to be believed and all justifiable inferences are to be drawn in [its] favor."  *Anderson*, 477 U.S. at 255.  After both parties have addressed the motion for summary judgment, the court must grant the motion *if* no genuine issues of material fact exist *and if* the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56.

Even if a district court "'believes that the evidence presented by one side is of doubtful veracity, it is not proper to grant summary judgment on the basis of credibility choices.'" *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013) (*quoting Miller v. Harget*, 458 F.3d 1251, 1256 (11th Cir. 2006)).  The court should not disregard self-serving statements made in sworn testimony simply because they are self-serving at the summary judgment stage, and if the self-serving statements create a genuine issue of material fact, the court should deny summary judgment on that basis. *Id.* at 1253.

### III.  DISCUSSION

Murphree asserts that his employer discriminated against him because of his race, and also retaliated against him because of his complaints of race discrimination, all in violation of Title

VII.  The court will address these allegations separately below.

**A.  Race Discrimination in Failing to Select/Promote**

Murphree asserts that the Agency discriminated against him because of race when it failed to select him for the Alabama DAD position and the Tennessee DAD position

1.  Timeliness of Alabama DAD claim

The Agency asserts that "[t]he Alabama DAD non-selection claim is untimely because Plaintiff failed to consult with an EEO counselor within 45 days of the alleged discriminatory event." (D's Reply Br., doc. 31, at 29 (citing 29 C.F.R. § 1614.105(a)(1)).   As a jurisdictional prerequisite to filing a Title VII action, a federal employee must exhaust his administrative remedies.  *Shiver v. Chertoff,* 549 F.3d 1342, 1344 (11th Cir. 2008); 29 C.F.R. § 1614.105(a)(1). To exhaust his remedies, a federal employee must indeed "initiate contact with [an EEOC Counselor] within 45 days of the date of the matter alleged to be discriminatory, or ... within 45 day of the effective date of the action." 29 C.F.R. § 1614.105(a)(1).  "Generally, when the claimant does not initiate contact within the 45-day charging period, the claim is barred for failure to exhaust administrative remedies."  *Shiver,* 549 F.3d at 1344.

In the instant case, Murphree learned of his non-selection for the Alabama DAD position on December 7, 2007, and sought EEO counseling on March 28, 2008.   Because 111 days elapsed  between those dates, the March 28, 2008 counseling date is untimely if that date represents his first EEO counseling.   The court acknowledges being perplexed about Murphree's argument on this issue: he appears to be arguing, on one hand, that he did not consult an EEO Counselor because Buehler threatened him and discouraged him from doing so, but he is also arguing, on the other hand, that he understood Buehler and/or Harris to represent an EEO

Counselor. While those arguments, taken together, appear nonsensical, the court will address these arguments as alternative ones, assuming he is presenting the argument that his conversations with Buehler and/or Harris represent initiation of contact with a Counselor, and presenting as well the alternative argument that even though he did not initiate timely contact with a Counselor, equitable tolling should apply.

Murphree first argues that his conversations with Buehler and Harris in December of 2007 represent initiation of contact with a Counselor within the meaning of the regulation quoted above. *If* he is correct, these conversations were either contemporaneously with his discovery that Wilson was selected as Alabama DAD or within a few days of that discovery, and thus, his claim would be timely.

As to whether his conversation with Bueler represents initiation of contact with a counselor, the facts show as follows. Within a week of discovering that an African American employee was selected for the Alabama DAD job in his stead, Murphree testified that he spoke via phone call to Buehler, and complained of race discrimination in that job selection. As Murphree relates the conversation, Buehler did not specifically respond to the allegations of race discrimination and advised him to accept his non-selection and move on. Even if this contact suffices as contact with an EEO Counselor, Murphree could not reasonably have misunderstood that statement as the beginning of the EEO process. Murphree does not relate any words in that conversation that would indicate to Buehler that he was treating her as an EEO Counselor, that would indicate to Murphree that Buehler was treating the conversation as initiating EEO contact and would follow up with or relay the complaint to an EEO Counselor, or otherwise to create a misunderstanding on his part that Buehler was acting as an EEO Counselor.

Despite the *argument* in Murphree's responsive brief—which is not *evidence*—that he demanded Buehler do something about the race discrimination, the evidence reflects that Murphree did not specifically demand that Buehler initiate the EEO process or advise him how to do so.  As a DM, Murphree was certainly aware of the EEO process and understood how to initiate EEO contact, and Buehler would have reasonably assumed that he knew how to and could properly initiate EEO contact with an official EEO counselor without her assistance if he so chose; indeed, he eventually did so in March of 2008.

Murphree also argues that his communication with Harris in December of 2007 represents initiation of contact with an EEO Counselor.   Harris acknowledges that Murphree complained to her that the selection of Wilson represented race discrimination, but Harris was not an EEO Counselor and testified that Murphree did not ask her to do anything on his behalf regarding the EEO process nor did she offer to do so.  Harris testified that she understood she was listening to Murphree as a friend who was disappointed in not being selected and who was blowing off steam.  Although, as Murphree points out, Harris testified that she would normally refer any complaints of discrimination to the EEO office, she also testified that she did not do so in this case because she did not understand the conversation to be a true attempt to initiate the EEO process.  Further, she was not dealing with a person who needed help navigating the EEO process and who was unfamiliar with it; Murphree was a DM trained in the EEO process.  And, in any case, Harris's testimony about what she would normally do as a courtesy to the complainant does not somehow transform her into an EEO Counselor falling within the regulation nor did she make any statements to Murphree that would lead him to believe that she was acting as one.

As support for his argument on this issue, Murphree proffers the Ninth Circuit decision of

*Kraus v. Presidio Trust Facilities Div./Residential Mgmt. Branch,* 572 F.3d 1039 (9th Cir. 2009). As that decision states, the EEOC has consistently interpreted 29 C.F.R. § 1614.105 as follows: "a complainant may satisfy the criterion of EEO Counselor contact by initiating contact with any agency official logically connected with the EEO process, even if that official is not an EEO Counselor, and by exhibiting an intent to begin the EEO process."  572 F.3d at 1044 (quoting EEOC Mgmt. Directive 110, at ch. 2, § I.A. n. 1, 1999 WL 33318588 (Nov. 9, 1999)).

In *Kraus,* the plaintiff complained the same day as the alleged discriminatory incident to the company's EEO *officer* but not to the EEO *Counselor*.  In determining that this contact with the EEO officer met the regulation's requirement, the Court of Appeals referenced and deferred to Agency decisions demonstrating that "agency official[s] logically connected with the EEO process" encompassed EEO personnel who held titles like EEO officer as long as they were connected with the EEO process within the Agency.   The Ninth Circuit also explained that "'the purpose of Title VII's exhaustion requirements ... is to provide [the agencies with] an opportunity to reach a voluntary settlement of ... employment discrimination dispute[s] through informal processes before resorting to the formal EEO complaint process."  *Kraus,* 572 F.3d at 1045 (quoting *Jasch v. Potter,* 302 F.3d 1092, 1094 (9th Cir. 2002)).  Finding that the EEOC's approach of counting contact with agency officials locally connected with the EEO process (such as the EEO *officer*), even if the official is not the EEO *Counselor,* was pragmatic and consistent with the purpose of Title VII's exhaustion requirement, the Ninth Circuit reversed the district court's grant of summary judgment on the claim.

As well as being non-binding, the *Kraus* decision does not provide strong support for Murphree's position.  Unlike the plaintiff in *Kraus,* Murphree did not complain to an EEO officer.

33

He complained to his supervisor—Buehler, who made the decision—and to Harris—the person temporarily holding the position he wanted—and both Buehler and Harris understood the complaint to be  blowing off steam in disappointment at not being selected rather than initiating an EEO complaint.  They made no promise to relay his complaint to EEO personnel, and Murphree did not specifically ask them to do so.  The court finds the non-binding *Kraus* case to be distinguishable from the instant set of facts.

Murphree also cites an unpublished D.C. Circuit case, not as support but to distinguish his facts.  *See Acklin v. Natl'l Gallery of Art Bd. of Trustees,* 1986 WL 15790 (D.C. Cir. 1986).  However, Murphree provides no case with analogous facts to support his position, and the court is aware of none.  Therefore, the court FINDS that neither Buehler nor Harris acted as an EEO Counselor and neither acted as an agency official logically connected with the EEO process within the meaning of the regulation.

As another alternative argument, Murphree argues that even if his contacts with Buehler and/or Harris do not equal "consulting with a Counselor" within the meaning of the regulation, then the doctrine of equitable tolling should apply and allow him to bring the claim. He points to Buehler's statement that he should "just let it go" and alleged subsequent retaliatory actions as misconduct, claiming that these actions justify applying the doctrine of equitable tolling.

The time limit of the regulation in question is indeed "subject to waiver, estoppel and equitable tolling."  29 C.F.R. § 1614.604(c); *see Zipes v. Trans World Airlines,* 455 U.S. 385, 393 (1982).  However, "[t]he Supreme Court has made clear that tolling is an extraordinary remedy which should be extended only sparingly." *Justice v. United States,* 6 F.3d 1474, 1479 (11 th Cir. 1993) (citing *Irwin v. Dep't of Veterans Affairs,* 498 U.S. 89, 94-95 (1990)).

As the party arguing that equitable tolling applies, Murphree has the burden of showing that the equitable remedy is warranted. *Justice,* 6 F.3d at 1479.   The Supreme Court has explained the circumstances appropriate for equitable tolling:

> [w]e have allowed equitable tolling in situations where the claimant has actively pursued his judicial remedies by filing a defective pleading during the statutory period, or where the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass.  We have generally been much less forgiving in receiving late filings where the claimant failed to exercise due diligence in preserving his legal rights.  Because the time limits imposed by Congress in a suit against the Government involve a waiver of sovereign immunity, it is evident that no more favorable tolling doctrine may be employed against the Government than is employed in suits between private litigants.

*Irwin,* 498 U.S. at 96 (addressing the untimely filing of a discrimination suit against the Government after EEOC notification letter).

In the instant case, Murphree provides no evidence that he has actively and diligently pursued his remedies.  While his testimony and that of Harris do reflect that he complained to Buehler and Harris of race discrimination, the evidence also reflects that, in those conversations with Harris nor Buehler, neither supervisor said anything that Murphree could reasonably understand to be initiating the EEO process.  Further, while Murphree characterizes Buehler's statements to him as threats in his brief, the evidence—the testimony about the circumstances and statements made— does not reflect that she threatened him.  He also characterizes Buehler's conversation with him about his complaint as discouraging him from pursuing his EEO rights, but the court finds that the evidence presented in the light most favorable to Murphree nevertheless fails to reveal misconduct or trickery or other conduct on the part of Buehler or Harris of the nature that would invoke equitable tolling.

35

Therefore, the court FINDS that Murphree has not met his burden to show that this extraordinary remedy is warranted.  Murphree was a DM with the knowledge and resources available to him to pursue his complaint with the EEO office in a timely manner, and he did not actively and diligently do so as to his complaint of race discrimination regarding the Alabama DAD position.  The court FINDS that he did not timely exhaust his administrative remedies as to that claim nor does equitable tolling apply to allow him to bring it tardily; the claim is barred.

Having determined that Murphree has not properly exhausted his administrative remedies as to that claim, the court notes that the Agency raises the exhaustion defense in connection with a motion for summary judgment, not a motion to dismiss.  However, the Eleventh Circuit has explained that because the exhaustion defense "is a matter in abatement and not generally an adjudication on the merits [, it] is not ordinarily the proper subject for a summary judgment; instead it 'should be raised in a motion to dismiss, or be treated as such if raised in a motion for summary judgment.'" *Bryant v. Rich,* 530 F.3d 1368, 1375 (11th Cir. 2008) (addressing the exhaustion requirement under the PLRA, not Title VII) (quoting *Ritza v. Int'l Longshoremen's & Warehousemen's Union,* 837 F.2d 365, 368-69 (9th Cir. 1988)); *see Tillery v. U.S. Dep't of Homeland Sec.,* 402 Fed. Appx 421, 424 (11th Cir. 2010) (unpublished Title VII case applying *Bryant's* reasoning regarding dismissal for failure to exhaust remedies to the Title VII context and rejecting the argument that *Bryant* is applicable only to the PLRA's exhaustion requirement). The court therefore will treat this issue as if it were raised on a motion to dismiss.

In sum, the court FINDS that Murphree did not consult with an EEO counselor within 45 days of learning that the Agency selected Wilson for the Alabama DAD position; therefore, he has not administratively exhausted his claim regarding that incident.  Because the finding that

36

Murphree has not exhausted his administrative remedies is not an adjudication on the merits, the court TREATS the Agency's motion on this claim as if it were a motion to dismiss, FINDS that the motion is due to be GRANTED and that the claim of discrimination based on that incident is due to be DISMISSED WITH PREJUDICE.

    2.  Merits of the Claims for Race Discrimination on DAD selections

Murphree asserts that the Agency denied him "promotions" – the Alabama DAD position and the Tennessee DAD position based on race, claiming that he was more qualified than Wilson (the African American employee selected for the Alabama DAD position) and Carpenter (the African American employee selected for the Tennessee DAD position. The court will discuss the Tennessee DAD selection, and – given that it is already discussing the law applicable to "failure to select/promote" claims – it will also address *as an alternative ruling* the merits of the Alabama DAD claim.

To establish a *prima facie* case for disparate treatment in a race discrimination failure to select/promote/hire case, a plaintiff must show: " (i) he or she belonged to a protected class; (ii) he or she was qualified for and applied for a position that the employer was seeking to fill; (iii) despite qualifications, he or she was rejected; and (iv) the position was filled with an individual outside the protected class." *Vessels v. Atlanta Indep. Sch. Sys.,* 408 F.3d 763, 768 (11th Cir. 2005).

    *a. Tennessee DAD*

The Agency acknowledges in its brief that Murphree has established a *prima facie* case

on the claim for discriminatory failure to select him as the Tennessee DAD.[6]  (doc. 19, at 42).  It,

therefore, must articulate a legitimate, non-discriminatory reason for selecting Carpenter, an

African American employee who was a Tennessee DM at the time.  *See Wilson v. B/E*

*Aerospace,* 376 F.3d 1079, 1087 (11th Cir. 2004).

The Agency articulates the following reasons: Clevenger, the selecting Tennessee AD,

felt strongly that the DAD should be someone from Tennessee who was familiar with the

operations of the Disability Determination Service ("DDS") as well as Clevenger's own

management style and expectations, and Clevenger and Carpenter had worked together for years.

The court FINDS that the Agency has articulated legitimate, non-discriminatory reasons, and

thus, Murphree has the burden to establish that those reasons represent pretext for discrimination.

The Eleventh Circuit has explained that in asserting pretext, a plaintiff "must confront the

employer's seemingly legitimate reason for not promoting [him] 'head on and rebut it.' *Kidd v.*

*Mando Am. Corp.,* 731 F.3d 1196, 1206 (11th Cir. 2013) (quoting *Chapman v. AI Transp.,* 229

F.3d 1012, 1030 (11th Cir. 2000) (en banc)).  In turn, this court's "inquiry is limited to whether

the employer gave an honest explanation of its behavior."  *Elrod v. Sears, Roebuck, & Co.,* 939

F.2d 1466, 1470 (11th Cir. 1991).

Murphree attacks Clevenger's reasons for selecting Carpenter by arguing that the

Agency's failure to follow its own requirements to fill the position by a competitive process

---

[6] Although Murphree did not apply for the Tennessee DAD position, his brief focuses on
the Agency's alleged failure to follow its own procedures requiring solicitation of interest and a
competitive hiring process.  If Murphree is correct, then the Agency's failure to follow
procedures prevented him from applying for the job and should not preclude him from
establishing his *prima facie* case.  *See Zimmerman v. Dep't of the Army,* No. 1954494, 1996 WL
159290, at *2 (EEOC April 1, 1996).   In any event, the Agency acknowledges for purposes of
the motion for summary judgment that he meets his *prima facie* case.

represents evidence of pretext for discrimination.  Although this attack does not address the reasons for selecting Carpenter "head-on," the court recognizes that because the Agency did not give Murphree the opportunity to apply for the position, the usual weighing of candidates' qualifications and experience did not occur.  Accordingly, the court will address Murphree's argument.

The Agency's procedures provide that the Agency must utilize competitive selection procedures for reassignment of an employee to a position with more promotion potential. Murphree argues that the DAD position has more promotion potential than the DM position from which Carpenter was reassigned, and thus, the Agency's failure to use the competitive selection process means that the reassignment violated those procedures.  Because, as set out more fully in the fact section, Barnes, Buehler, and Clevinger all testified that the DAD position is the same GS-14 pay grade as the Level 1 DM and does not hold more promotion potential, Murphree must present *evidence*—more than conclusory assertions—to support this position or to create a genuine issue of material fact.

Murphree's evidence is as follows: (1) Barnes knew that Murphree was seeking a DAD job in the Southeast because he had applied unsuccessfully for the Alabama DAD position (filled December 6, 2007); (2) at the time of the selection of the new Tennessee DAD, Barnes was aware that Murphree had filed a pending EEO claim for discrimination based on race;  the DAD job description is listed as "the alter-ego to the Area Director"; (3) two out of the last three Area Directors appointed within Barnes's region were filled by DADs; (4) subsequent to the discovery period, Barnes filled vacant AD positions in Mississippi, South Carolina, and Alabama with candidates who had been in the DAD position prior to their selection; (5) at the creation of the

39

DAD position, the Agency "touted [it] as a succession planning tool and as a training position to create a qualified pool of experienced employees to be ready to fill the void created by the impending retirement of many Area Directors nationwide" (Doc. 24-7, at 2); (6) a higher number of African Americans have been promoted to DAD during Barnes's tenure using a non-competitive selection process; (7) the Agency did not use a competitive process to select the Tennessee DAD; (8) the Agency did not solicit interest in the Tennessee DAD position from SG-14 pay grade employees, whether in a competitive or non-competitive process. In short, Murphree's argument is that Barnes knew that highly qualified Caucasian Murphree would be interested in the Tennessee AD job and Barnes wanted an African American candidate to have it instead, so Barnes violated company policy requiring a competitive selection process (where Murphree would have an opportunity to apply) and hand-selected his own candidate.

This court cannot accept Murphree's evidence as raising a genuine issue of material fact on pretext. His argument is focused on *Barnes*: Barnes's knowledge that Murphree had applied for the Alabama DAD job and had complained about race discrimination; and the higher number of African Americans selected for positions during Barnes's tenure. However, the evidence reflects that Clevenger, a Caucasian, selected Carpenter for the job. The evidence does not reflect that Clevenger knew Murphree was interested in the job or knew Murphree had applied unsuccessfully for the Alabama DAD position. Without that knowledge, Clevenger could not have engaged in some kind of discriminatory plot to prevent him from applying for the Tennessee DAD position. Further, the evidence does not show that Barnes manipulated Clevenger's candidate selection in any way, such as rejecting Caucasian candidates or telegraphing that only African American candidates would be welcomed. Although Murphree

attempts to characterize Barnes as the ultimate decision maker, the evidence does not support

that characterization.  Rather, the evidence simply shows that when Clevenger brought her

selection of Carpenter to Barnes, he concurred with that recommendation.

Finally, as to the dispute whether the filling of the DAD position without using a

competitive selection process was a violation of the Agency's procedures, the court states that,

even assuming *arguendo*—without deciding—that the selection did violate Agency procedures,

Murphree has not established pretext.  The evidence does not reflect that the Agency had ever

gone through the competitive selection process when filling the DAD position with Level 1 DM

candidates.  So, if Agency personnel were indeed wrong in moving a Level 1 DM to a DAD

position without instituting the competitive selection process, that mistake was not a new one.

The evidence certainly did not reflect that the Agency had only begun violating this procedure

when Murphree began applying for the DAD positions, and thus, that the Agency began violating

the procedure in a discriminatory attempt to prevent Murphree from obtaining the DAD position.

Further, the evidence does not specifically establish that Barnes was the only one in the Agency

who violated the procedure.

Put another way, even if the Agency's were guilty of violation of a procedure, the

violation does not establish pretext or raise an inference of discrimination unless some tie exists

between the violation and discrimination.  Here, the evidence does not reflect that the Agency

treated the move from Level 1 DM to DAD as one requiring a competitive selection process

*before* Murphree applied, and no *evidence* otherwise ties the alleged violation to discrimination.

Therefore, the court FINDS that Murphree has not met his burden of producing evidence

raising a genuine issue of material fact that the Agency's proffered legitimate, non-discriminatory

41

reason for not hiring Murphree for the Tennessee DAD position was pretextual.  The Agency's motion for summary judgment is due to be GRANTED as to this discrimination claim based on that position.

> b.  *Alabama DAD*

As discussed previously, the court found that Murphree has not exhausted his administrative remedies on the Alabama DAD claim.  As an alternative ruling on the merits, however, the court FINDS that *if* he had exhausted them and/or *if* equitable tolling somehow applied, the Agency is nevertheless entitled to summary judgment on the merits for the reasons discussed below.

The Agency does not dispute for summary judgment purposes that Murphree has established his *prima facie* case, but proffers non-discriminatory reasons for choosing Wilson, an African-American, over Murphree: including Wilson's "regional presence"; his initiative and his good communication skills; his motivation; her opinion that he did a better job of making a presentation at the Alabama managers' meeting than did Murphree; Wilson's success in addressing an employee relations challenge in the Birmingham office and "turning the ship around" at that office; his superior labor relations experience in working at the three largest offices in Alabama (larger than Murphree's Gadsden office) with the most labor relations challenges.   The court FINDS that the Agency has met its burden to articulate legitimate, non-discriminatory reasons for its choice of Wilson.

Murphree argues that these reasons are pretextual and argues that he was more qualified than Wilson.  To raise pretext successfully in a "failure to select/promote" case, however, a plaintiff may not simply show he was the more qualified candidate.  If that were the case, then

this court would be placed in the position of re-weighing qualifications and sitting as "'a super-personnel department'" to re-examine the employer's business judgments and second-guess whether they were fair and appropriate, a role the Eleventh Circuit has rejected as inappropriate. *See Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1092 (11th Cir. 2004) (quoting *Lee v. GTE Fla, Inc.*, 226 F.3d 1249, 1254 (11th Cir. 2001). Rather, this court's role is to determine whether the selection of Wilson over Murphree, unfair or not, wise or not, was *discriminatory,* and so, the court's "inquiry is limited to whether the employer gave an honest explanation of its behavior." *Elrod v. Sears, Roebuck, & Co.,* 939 F.2d 1466, 1470 (11th Cir. 1991).

> The Eleventh Circuit has explained the pretext inquiry as follows:

> To show pretext, the employee must confront the employer's seemingly legitimate reason for not promoting [him] "head on and rebut it." *Chapman [v. AI Transp.,* 229 F.3d 1012, 1030 (11th Cir. 2000) (en banc) ] (citing *Alexander v. Fulton Cntyl, Ga.,* 207 F.3d 1303, 1341 (11th Cir. 20000). The plaintiff 'cannot succeed by simply quarreling with the wisdom of that reason." *Id.* Indeed, "a plaintiff cannot prove pretext by simply arguing or even by showing that [he] was better qualified than the person who received the position [he] coveted." *Springer v. Convergys Customer Mgmt. Grp.,* 509 F.3d 1344, 1349 (11th Cir. 2007) (per curiam) (internal brackets & quotation marks omitted). The plaintiff "must show that the disparities between the successful applicant's and [his] own qualifications were of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff." *Id.* (internal quotation marks omitted.).

*Kidd v. Mando Am. Corp.,* 731 F.3d 1196, 1206 (11th Cir. 2013).

> The court cannot accept Murphree's argument about his qualifications being superior to Wilson. As the *Kidd* decision reiterates, the Eleventh Circuit's well-established law prohibits this court from re-weighing qualifications and deciding which candidate an employer *should* have hired. Rather, this court must simply review the qualifications of Wilson and Murphree and determine whether the difference between the two is of "such weight and significance that no

reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff." *Id.*

The court has looked at Murphree's experience and qualification and has looked at Wilson's as well.   They are fully set out in the facts and the court will not reiterate them here. The court notes that Murphree's own evaluation of subjective qualities, such as decisiveness and effectiveness as a speaker, which evaluation disagrees with Buehler's, does not create a genuine issue of material fact.  The inquiry is not whether Murphree evaluated himself differently than Buehler, whether Murphree was more qualified, or even whether Buehler was wrong in not choosing Murphree.  Buehler's reasons for choosing Wilson—including but not limited to the fact that he had experience in the three largest Alabama Agency offices and had "turned the ship around" in a challenging situation in the Birmingham office—are reasonable, and Murphree has not presented evidence to raise a genuine issue of material fact that these reasons are not honest. His own opinion about his relative merit certainly does not raise such a genuine issue of material fact.  The court finds that Murphree has not met his burden of  showing that the disparities between Wilson's qualifications and his own were of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen Wilson.

The court notes that Murphree argues that he has presented *direct evidence* of discrimination supporting the Alabama DAD selection, pointing to a conversation about what "Harris told Plaintiff that Buehler had told her (Harris)" about what Barnes had previously said to Buehler.  (Pl.'s Br., Doc.  ).  Because this "evidence" is triple hearsay, it is neither admissible nor capable of being presented in a form that would be admissible; it is not a "fact" for this court's consideration under Rule 56(c).  *See* Fed. R. Civ. P. 56(c).  The testimonies of Buehler and

44

Barnes do not support this characterization of their conversation.  Accordingly, Murphree is incorrect to point to this testimony as establishing direct evidence of discrimination.

Murphree also claims that Buehler's refusal to obtain and consider all relevant and readily available sources of information about the competing candidates—such as personnel files, performance appraisals, statements of interest—was in violation of the competitive selection process and indicates a premeditation to select Wilson.  In response, the court first notes that the evidence reflects that the Agency treated this selection as a non-competitive process; the Agency form listing the four candidates characterized the process as "non-competitive."  Further, as Buehler was very familiar with both candidates and supervised both of them, her failure to consider documents fails to raise a genuine issue of material fact that her legitimate reason for hiring Wilson was pretextual.

Finally, the court acknowledges Murphree's argument that Buehler's explanation of the reason she chose Wilson for the Alabama DAD is undermined by her contradictory statement to Earley.  However, Murphree mischaracterizes Buehler's statement to Earley.  Earley did testify that Buehler told her at some unspecified time that Murphree was a "good fit" for the DAD position and indicated she expected to speak with Barnes about him.  Buehler remembers the conversation differently.

Assuming that Buehler did make those statements to Earley, however, her characterization of Murphree as "a good fit" is not the same as saying he is a *better candidate than Wilson*.  Earley does not specify the date of the conversation, which could have occurred before Buehler knew that Wilson was also interested in the position.  Because more than one candidate can be a "good fit" for a position, and because that statement does not contradict her

45

reasons for determining that Wilson was the better candidate of the two, the court finds that this testimony does not raise a genuine issue of material fact on the issue of pretext.

Accordingly, as an alternative ruling, the court FINDS that the Agency is entitled to summary judgment on the merits of the claim involving the Alabama DAD position.

### B.  Race Discrimination - Disparate Treatment/Discipline

Murphree also alleges that the Agency treated him differently in disciplining him more harshly than African American employees.  To establish a *prima facie* case in a disparate treatment case, a plaintiff must show that

> (1) [he] is a member of a protected class; (2) [he] was subjected to an adverse employment action; (3) [his] employer treated similarly situated employees outside of [his] protected class more favorable than [he] was treated; and (4) [he] was qualified to do the job. . . . When a plaintiff alleges discriminatory discipline, to determine whether employees are similarly situated, we evaluate "whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways.**"**

*Burke-Fowler v. Orange Cnty., Fla.,* 447 F.3d 1319, 1323 (11th Cir. 2006) (quoting *Maniccia v. Brown,* 171 F.3d 1364, 1368 (11th Cir. 1999)).

The proffered comparator must be "similarly situated in all relevant respects."  *Holifield,* 115 F.3d at 1562.  Further, the proffered comparator's misconduct should be "nearly identical." *Stone & Webster Const., Inc. v. U.S. Dep't of Labor,* 684 F.3d 1127, 1135 (11th Cir. 2012).  In addition, the court must consider whether the decision makers were the same for the comparators' discipline because "differences in treatment by different supervisors or decision makers can seldom be the basis for a viable claim of discrimination."  *Silvera v. Orange Cnty. Sch. Bd.,* 244 F.3d 1253, 1261 n. 5 (11th Cir. 2001); *see also Chapter 7 Trustee v. Gate Gourmet, Inc.,* 683 F.3d 1249, 1257 (11th Cir. 2010) (quoting the above language in *Silvera* with

approval).

In the instant case, Murphree points to two disciplinary actions as discriminatory: his one-day suspension in June 2008 and the downgrading of his ROC award to a lesser award in May 2008. Buehler and Wilson made the decision to suspend Murphree, and Buehler made the decision to give him a lesser award than the ROC.  Murphree has provided comparators**;** however, as detailed in the fact section of the brief, the comparators' misconduct was not nearly identical to that of Murphree.  None involved the discipline of a GS-14 DM who was found to have engaged in jokes or comments of a sexual nature with his management team and/or who was found to allow inappropriate sexual jokes to continue in the office among those he supervised without invoking discipline.  Further, the decision makers were not Buehler or Wilson.

The court FINDS that Murphree has not provided evidence of a similarly situated comparator disciplined differently by the same decision makers, and thus, he has not established his *prima facie* case on these claims.  The motion for summary judgment is due to be GRANTED as to the disparate discipline claims.

### C.  Hostile Work Environment

Murphree also alleges that the Agency subjected him to a hostile work environment.  The court cannot discern from the Complaint and the responsive brief whether he intends to raise hostile work environment as both a race discrimination claim *and* a retaliation claim, and therefore, will assume that he intends both.  In any event, Murphree points to and the Agency's

EEO process accepted the following incidents[7] of alleged harassment: (1) undermining Murphree's supervisory authority by a) failing to discipline Garrison for her improper claims handling, although Murphree recommended that she be disciplined; and b) forcing Murphree to conduct a fact-finding interview with Garrison over his objection that she would retaliate against him and that the first-line supervisor should conduct it; (2) overlooking Murphree for promotion/advancement opportunities when he was a) not selected for the Alabama DAD position and b) not given an opportunity to apply for the Tennessee DAD position; and (3) ridiculing, humiliating and threatening him with disciplinary action, including a) when the Agency re-directed the investigation of Garrison's misconduct such that Murphree was investigated; b) unfairly and harshly disciplining him for the inappropriate conduct of others (including his suspension and the ROC downgrade); and c) conducting an integrity review.

To establish a *prima facie* case of hostile work environment based on race, brought pursuant to Title VII, a plaintiff must show

> (1) that he belongs to a protected group; (2) that he has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the employee . . .; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability.

*Miller v. Kenworth of Dothan, Inc.*,  277 F.3d 1269, 1275 (11th Cir. 2002).  The Agency challenges Murphree's ability to establish elements three and four, asserting that the alleged

---

[7] Murphree also argues in his brief that Buehler's and Harris's failing to assist him in processing his complaint of race discrimination in the Alabama DAD selection was an incident of harassment making up a hostile work environment.  However, this conduct was not specifically listed as an issue accepted as a Complaint in the Agency's letters of August 15, 2008 and May 11, 2009, and thus would be barred for failure to exhaust.

hostile and harassing acts were not based on his race and were not sufficiently severe or pervasive to alter the terms and conditions of employment.

The court agrees that Murphree has not presented evidence raising a reasonable inference that the "harassing" acts were *based on race*.  To the extent that Murphree is attempting to argue that these alleged acts of harassment were race-based only because they occurred in retaliation for his complaining of race discrimination, the court will address them under the retaliation claims. As to the list of harassing acts listed on the previous page, the Agency presents plausible, non-discriminatory reasons for those actions, none of which was based on race, and Murphree does not present *evidence* contradicting those reasons or otherwise specifically tying the alleged harassment to his race.

For example, as to the incidents that Murphree characterized as undermining his supervisory authority,  Murphree claims that the incidents were race-based but provides no *evidence* tying them to race.  The Agency's explanation for requiring him to conduct the Garrison interview is reasonable and not based on race: when an office employee is accused of claims of misconduct, a sensitive issue, requiring the top management person at the office to conduct the interview makes sense.  Murphree makes the conclusory assertion in his affidavit—with no citation to policy manuals and no examples of past history as support—that Agency policy provides for the first-line supervisor to conduct the interview.

Even if that is a true characterization of the Agency policy, he is the manager of the office and ultimately responsible for what happens at his office; and when allegations arise of serious misconduct at his office and under his watch, requiring the office manager to conduct the investigation instead of the first-line supervisor  is reasonable and does not in and of itself raise

49

an inference of racial harassment.   Such a requirement is reasonable even if normal company policy calls for the first-line supervisor to conduct the investigation, and it is particularly reasonable when the first-line supervisor was a witness that brought the misconduct to light in the first place.  To the extent that Murphree was worried about reprisals from Garrison and allegations of sexual harassment from her, he handled the worry by ensuring that he had witnesses to the interview with Garrison.  In the end, Murphree is complaining of harassment because he was required to take responsibility and manage his office in a difficult situation.   But managing is part of his job title, and he should do his job, instead of whining about harassment.

Further, the explanation for the Agency's failing to discipline Garrison as Murphree recommended is also not tied to race:  given Garrison's complaint against Murphree of sexual harassment, the Agency made the decision that allowing Murphree to discipline Garrison during or after the investigation on that complaint was impolitic.  Whether that decision was right or wrong, the evidence reflects that it was a practical attempt to avoid adding more mud to the legal quagmire often accompanying sexual harassment claims and was not a race-based action.

As to the other incidents that Murphree characterizes as harassment, the court has addressed most of them in the race discrimination sections above, and discussed the lack of evidence tying them to race.  One incident not discussed above was the integrity review; however, that review also has no tie to race when the evidence reflects that Murphree's supervisor received a computer-generated integrity alert, followed her responsibility to investigate the alert, accepted Murphree's explanation regarding his computer use, and did not discipline him as a result.

In short, the court FINDS that Murphree has failed to raise a genuine issue of material

fact that the harassment was race-based, and thus, has failed to establish an essential element of his *prima facie* case.  As an alternative ruling, the court also FINDS that Murphree has failed to establish that the harassment was sufficiently severe and pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; thus, Murphree has also failed to establish the fourth element of his *prima facie* case.

The court FINDS that the Defendant's motion for summary judgment is due to be GRANTED on this claim because he has not established his *prima facie* case.

### C. Retaliation

Murphree also argues that the Agency *retaliated* against him for complaining about race discrimination by committing the same list of retaliatory actions of harassment and discipline. Although the court has found that the evidence does not support that the materially adverse actions were themselves race-based, that determination does not mean that the actions could not be performed in retaliation for complaints of race discrimination  Title VII prohibits an employer from retaliating against an employee who has "opposed any practice made unlawful employment practice by [Title VII], or because he has made a charge ... or participated in any manner in any investigation, proceeding or hearing under [Title VII]."  42 U.S.C. § 2000e-3(a).

To establish a *prima facie* case of retaliation, a plaintiff must show "(1) that [he] engaged in an activity protected under Title VII; (2) [he] suffered a materially adverse action; and (3) there was a causal connection between the protected activity and the adverse action."  *Kidd v. Mando Am. Corp.,* 731 F.3d 1196, 1211 (11th Cir. 2013).  If the plaintiff establishes his *prima facie* case, the employer must articulate a legitimate, nonretaliatory reason for the challenged action, and, if it does so, then plaintiff has the burden to establish that the employer's proffered

reason for that action was pretext for retaliation.  *Pennington v. City of Huntsville,* 261 F.3d 1262, 1266 (11th Cir. 2001).

To show pretext, a plaintiff must demonstrate that the employer's "proffered reason was not the true reason for the employment decision."  *Texas Dep't of Cmty. Affairs. v. Burdine,* 450 U.S. 248, 256 (1981).  He must "confront the employer's seemingly legitimate reason for [the adverse employment action ] 'head on and rebut it.'"  *Kidd,* 731 F.3d at 1206.   To do so, he must "cast sufficient doubt on the defendant's proffered ... reasons to permit a reasonable factfinder to conclude that the employer's proffered 'legitimate reasons were not what actually motivated its conduct.'"  *Combs v. Plantation Patterns,* 106 F.3d 1519, 1538 (11th Cir. 1997) (quoting *Cooper-Houston v. Southern Ry. Co.,* 37 F.3d 603, 605 (11th Cir. 1994)).  He can do that by demonstrating "'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'"  *Combs,* 106 F.3d at 1538 (quoting *Sheridan v. E.I. DuPont de Nemours & Co.,* 100 F.3d 1061, 1072 (3rd. Cir. 1996)).  However, a plaintiff "'cannot succeed by simply quarreling with the wisdom of that reason ....'"  *Kidd,* 731 F.3d at 1206 (quoting *Chapman v. AI Tranport,* 229 F.3d 1012, 1030 (11th Cir. 2000)); *see Alexander v. Fulton Cnty., Ga.,* 207 F.3d 1303, 1341 (11th Cir. 2000) ("[I]t is not the court's role to second-guess the wisdom of an employer's decisions as long as the decisions are not [] motivated [by discrimination or retaliation]").

In the instant case, the Agency acknowledges that Murphree engaged in protected conduct and does not dispute that element for summary judgment purposes.  When the evidence is viewed in the light most favorable to Murphree, as the court must view it at this stage, it  reflects that he

52

complained of race discrimination to both Buehler and Harris shortly after Buehler selected Wilson as the Alabama DAD, in December of 2007.  He also filed an official EEO charge in March of 2008.  Thus, he has established protected conduct for the purposes of the motion for summary judgment.

As to the element of materially adverse action, a plaintiff must show that the action "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern & Santa Fe Ry. Co. v. White,* 584 U.S. 53, 68 (2006) (internal quotation omitted).  In the instant case, Murphree complains of the following alleged retaliatory conduct: the Agency's  (1) forcing Murphree to conduct a fact-finding interview with Garrison over his objection that she would retaliate against him and that the first-line supervisor instead should conduct it; (2) re-directing the investigation of Garrison's misconduct such that Murphree himself was investigated; (3) harshly and unfairly disciplining Murphree for his handling of the sexually-charged jokes occurring in the district office; (4) reducing Murphree's May 2008 performance award from a ROC to an Exemplary Contribution of Service award, which awarded less money; (5) conducting an integrity review; (6) not instituting a competitive selection process for the Tennessee DAD position so that Murphree had no opportunity to apply; and (7) undermining his authority as manager by not carrying out the discipline against Garrison that he, as her manager, recommended.

The court FINDS that the first, second, fifth, and seventh items on this list do not constitute materially adverse conduct.  As discussed above, requiring Murphree, as the office manager, to conduct a interview of an employee accused of serious misconduct at his office is not conduct that would have dissuaded a *reasonable* office manager from making or supporting a

charge of discrimination.   As to the second item, the evidence reflects that the investigation

conducted at the Gadsden office was conducted by an independent group and no evidence

suggests that the group was aware of Murphree's protected conduct, so no *reasonable* office

manager would see a connection between the two and be dissuaded from making or supporting a

charge of discrimination.  For the same reason, no "but for" causal connection would exist.  As to

the fifth item, the evidence reflects that the integrity review was computer generated, that the

review was standard procedure, that Buehler accepted Murphree's explanation, and that no

discipline occurred as a result; consequently, the review would not have dissuaded a *reasonable*

employee from making or supporting a charge of discrimination.

As to the seventh item on the list—failing to discipline Garrison for claims of

misconduct—the court notes that this *inaction* on the part of the company could only be

materially adverse to the extent that it undermined Murphree's authority as DM.  Because

Garrison had moved out of Murphree's office and away from his authority by the time the

decision was made to delay and then to table indefinitely Garrison's discipline, the Agency's

failure to discipline her would not have undermined his authority as a DM to any significant

degree; thus, its inaction would not have dissuaded a *reasonable* employee from making or

supporting a charge of discrimination.

To the extent, if any, that Murphree also challenges the Agency's failure to discipline

Garrison for her allegations of sexual harassment against Murphree as a materially adverse

action, the court rejects this position.  Murphree points to the investigative report's finding no

evidence to support those allegations except Garrison's own testimony, and claims that the

report, therefore,  supports his claim that she filed false claims against him.  But, some of her

54

claims involved incidents with no witnesses and, therefore, were "he said/she said" situations; consequently, finding a lack of supporting evidence is not the same thing as finding that the sexual harassment did not occur. Under these circumstances, the company's failure to discipline Garrison *for her allegations against Murphree* are reasonable and its inaction would not have dissuaded a *reasonable* employee in Murphree's position from making or supporting a claim of discrimination.

The remaining alleged materially adverse actions are the third, fourth and sixth items on the list:  (3) harshly and unfairly disciplining Murphree for his handling of sexually inappropriate conduct in the district office; (4) reducing Murphree's May 2008 performance award from a ROC to an Exemplary Contribution of Service award, which awarded him less money; and (6) not instituting a competitive selection process for the Tennessee DAD position so that Murphree had no opportunity to apply.  As to these items, the Agency does not argue that, taken individually and/or collectively, they fail to represent a materially adverse action, and the court FINDS that Murphree has indeed shown that materially adverse actions occurred subsequent to his protected conduct.  However, accepting these items as materially adverse does not end the inquiry.

The remaining element of Murphree's *prima facie* case requires his showing a causal link between the protected conduct and the materially adverse action.  As the Agency pointed out in its motion for reconsideration, the United States Supreme Court decided *Univ. of Tex. SW Med. Ctr. v. Nassar*, ___ U.S. ___, 133 S.Ct. 2517 (2013) during the briefing of this case and before the ruling on it.  That decision holds that "a plaintiff making a retaliation claim under § 2000e-3(a) must establish that his or her protected activity was a but-for cause of the alleged adverse

55

action by the employer." *Id.* at 2534.  The court now revises its analysis of the causation element

of the retaliation claim, applying the "but-for" standard of causation.

The Agency argues that the only evidence establishing a causal connection is the temporal

proximity between the protected conduct and the adverse action; notes Eleventh Circuit law

providing that if causality rests on temporal proximity alone, then the "temporal proximity must

be very close"; and, finally, asserts that the circumstances of the instant case are not close

enough.  (Def.'s Br., doc. 19, at 40 (quoting language from *Clark Cnty. Sch. Dist. v. Breeden,*

532 U.S. 268, 273-74 (2001)).

The evidence reflects that Murphree's first protected conduct occurred in December of

2007, when he complained of race discrimination to Buehler and Harris after the selection of

Wilson, and that he officially consulted an EEO Counselor in March of 2008.  Murphree

received notice shortly thereafter in April of 2008 that he would be disciplined as a result of the

investigatory report, a suspension that he considered harsh and that took effect in June of 2008.

Other alleged adverse actions, such as the reduced performance award, also occurred in 2008.

Although Buehler testified that her first notice of Murphree's protected conduct occurred

in late April, *after* at least one of the remaining items proffered as materially adverse actions, a

genuine issue of material fact exists that he complained to her of race discrimination in

December of 2007, *before* the April discipline.  While several months elapsed between the

December complaint and the April discipline, a reasonable argument exists that, given the

existence of a formal investigation in the interim, April was the earliest practical opportunity to

retaliate against Murphree.  Further, no question exists that Buehler received notice of

Murphree's protected conduct before the reduction of his performance award in May and before

the Tennessee DAD selection.   Finally, the evidence reflects that before the protected conduct,
Murphree had an unblemished work record and high work evaluations; just a few months *before*
Murphree's protected conduct, he received a high work evaluation commensurate with the ROC
award, and yet, he received a lesser award *after* the protected conduct.

Given this evidence, the court FINDS that a genuine issue of material fact exists
regarding whether the protected conduct was the "but for" cause of the adverse action by the
Agency.  Thus, the court FINDS that Murphree has met his *prima facie* case as to those adverse
actions.  Because Murphree has met his *prima facie* case, the Agency must articulate legitimate,
non-discriminatory reasons for the remaining adverse actions, and the court FINDS that it has
done so, as further discussed below.  Accordingly, Murphree has the burden to meet those
proffered reasons head on and establish that each is pretext for retaliation.  To determine whether
Murphree has met his burden, the court will address them separately below.

### Harshly and Unfairly Disciplining Murphree for Sexually-Inappropriate Conduct Occurring in the District Office

The Agency's legitimate, non-discriminatory reason for the discipline is that the February
20, 2008 investigative report regarding the Gadsden office reflected that Murphree engaged in
inappropriate conduct:  (1)  that he engaged in inappropriate conversations having sexual content
with management team members; and (2) that he, as the office manager, responded inadequately
to the Gadsden office employees' sexually-inappropriate conduct at the office.  At the beginning
of April of 2008, Buehler agreed to Wilson's proposal that Murphree receive a 2-day suspension,
and after Murphree objected, the discipline was reduced to a 1-day suspension that occurred on
June 12, 2008.   The court must determine whether Murphree's evidence meets his burden to

confront head on each of these legitimate, non-retaliatory reasons for the discipline.

*(1) Inappropriate Sexual Jokes Within the Management Team*

In an attempt to establish that the inappropriate sexually-charged joking among the management team was pretext for retaliation, Murphree presents his own testimony that he did not personally make such comments.  He implies that if he did not do so, then disciplining him for the comments of other management team members would be unfair and would raise a genuine issue of material fact as to pretext.  Murphree  does, however, acknowledge that Lott and Allen made inappropriate, sexually-charged comments and jokes in his presence but out of the hearing of non-management employees, and that he did not correct or discipline them for making these sexual jokes.

The court first notes that the investigative report upon which Buehler relied in disciplining Murphree specifically stated that he admitted engaging in sexual joking with his management team.  In her deposition testimony, Buehler stated that she never confronted Murphree about the investigative report's statement that he personally engaged in inappropriate comments or jokes with his management team, but that she took the team's report that he had admitted doing so and acted on that report.  (Doc. 21-5, at 44, pp. 229).  Thus, Buehler's reliance on that report's findings as accurate does not establish pretext unless she had notice at the time of the discipline that the report's findings might be untrue.  The parties point the court to no evidence that Buehler knew at the time of the discipline that the report contained inaccuracies.  Accordingly, the fact that Murphree *now contradicts* the report's findings and the fact that his deposition, taken *after* the discipline, contradicted the report's recording of his admissions about participating in the sexual jokes with his management team, do not raise a genuine issue of

58

material fact as to pretext for retaliation when Buehler relied on the report.

Yet even assuming *arguendo* that the report was inaccurate and Murphree did not himself engage in off-color joking, Buehler's testimony explains that her discipline decision focused not upon Murphree's own participation in the joke-telling but, rather, upon his failure to quash such inappropriate conduct on the part of his fellow management team members.  She testified that the decision to issue a suspension to Murphree was based less on whether he himself made inappropriate comments but was "more about that ... he wasn't leading by example with Jacque [Allen]  and Teresa [Lott], and that he didn't do enough to address their jokes and comments and situations. . . [and] because he's the Level I manager.  He's supposed to set the example, be the person that develops the other management folks."  (Doc. 21-6, at 55-56 & 64 pp. 229-230 & 238).

As is clear from this discussion, Buehler articulates a legitimate, non-retaliatory reason for the discipline: as the district manager, Murphree should have attempted to stop inappropriate sexual joking at all levels, including the management level, so his conduct of allowing such behavior in his management team without consequence was a leadership failure that justified discipline.  His failure meant that he missed an opportunity to lead his managers by example, to model for his managers how to correct inappropriate behavior, and to encourage his managers to repeat that correction when others demonstrated  similar behavior around the office.

Thus, Murphree's attempt to challenge the discipline as pretext because he personally did not engage in the joking misses the point and does not meet the non-retaliatory reason head on. Regardless of whether he personally made jokes, his failure to teach management that such joking was inappropriate represents a leadership failure according to Buehler; discipline for that

leadership failure does not raise a genuine issue of material fact regarding pretext.

Because a plaintiff must address each legitimate reason proffered for discipline and establish pretext for each, Murphree's failure to raise a genuine issue of material fact regarding pretext here dooms his retaliation claim. However, in an abundance of caution, the court also addresses the second reason proffered for his discipline.

### (2) Inadequate Response to Sexually-Inappropriate Conduct by Non-Managmement Employees

The second legitimate, non-retaliatory reason that the Agency gives for Murphree's discipline is that Murphree failed to address adequately the sexually inappropriate conduct occurring in the Gadsden district office by non-management employees. Murphree responds that he asked for advice from his supervisor, the DA before Buehler, who told him to counsel first, and he followed that advice in addressing the office misconduct. Thus, he argues that DA Buehler's disciplining him merely for following the advice of the previous DA is a disturbing inconsistency that raises a genuine issue of material fact as to whether the reason for the discipline was pretext for discrimination.

The evidence does indeed reflect that Murphree asked for advice from his DA regarding how to handle *some of the sexual misconduct* occurring in his office, that the DA told him to counsel first before disciplining, and that he followed that advice, discussing the inappropriateness of *some* sexually-charged conduct with individuals in his office. For example, he spoke to Garrison about the impropriety of her question to him: "would a blow job change your answer?" He also spoke to Lott about toning down sexually charged jokes she made around the office and about refraining from bringing a sex toy catalog to work. When Buehler

60

threatened to suspend him, the evidence also reflects that Murphree communicated to Buehler his request for advice from the DA and his following of that advice, but that Buehler and Wilson nevertheless disciplined him.

The Agency argues that Buehler did take into account the fact that Murphree followed the previous AD's advice on *some occasions*, and she decreased the discipline from two days' suspension to one.  However, the Agency asserts that Murphree cannot use the "counsel first" excuse for all misconduct in the office when Murphree did not, in fact, consistently follow that advice and counsel his employees about office misconduct.  As discussed previously, Murphree's suspension was based in part upon the sexually-charged joking of the management team, and *Murphree makes no claim to have counseled his team members about this conduct*.  Another reason Buehler gave for his suspension was his inappropriate handling of the joke about the "blow job contest" that circulated around non-management employees, and *Murphree makes no claim to have counseled office employees about this office joke.*

The court notes that the "blow job contest" was not the same incident as Garrison's sexually-charged remark made directly to Murphree, although both obviously refer to the same sexual act.  Rather, this "contest" was a joke going around the office about who was the best at performing that sexual act.  Although the joke occurred "often" according to Allen and occurred over several days according to Lott, no evidence reflects that Murphree was present when the joke was discussed.  However, Murphree does acknowledge that Lott told him about the sexual joke, that he himself did not counsel or discipline the employees involved, and that he did not tell Lott to counsel or discipline the employees involved for the conduct that had already occurred. He did tell Lott that it was inappropriate and that she needed to stop it *if* it occurred in the future.

This testimony confirms the investigative report's finding that Murphree "allow[ed] staff to engage in inappropriate conversations, jokes (by not addressing the behavior once made known to [him] ....)."  (Doc. 21-12, at 8, 13-14).

Murphree acknowledges that although he received notice of the inappropriate joke going around the office about the "blow job contest," he did not address it with the participants and did not direct one of his managers to address it unless it happened again.  Because he did *not* counsel the participants himself or advise his manager to counsel them at that point, Murphree cannot argue that the discipline was pretextual on the grounds that his response was consistent with the previous supervisor's advice to "counsel first."  Murphree raises no other grounds for pretext regarding discipline for this incident.  *See* Doc. 24-2, at 46-47.

In sum, Murphree has not addressed head on *each* of the legitimate, non-retaliatory reasons for his discipline, but, rather, his "counsel first" pretext argument applies to some but not all of those reasons.  Buehler decreased the sanction to reflect that Murphree had followed his supervisor's "counsel first" advice on some but not all of the conduct for which he was disciplined.  Murphree has not raised genuine issues of material fact as to *each* of the reasons he was disciplined, as required.  Accordingly, summary judgment is due to be GRANTED on the retaliation claim regarding Murphree's discipline.

<u>ROC Award</u>

Another related materially-adverse action was Buehler's decision not to present Murphree with a ROC award in 2008 (based on fiscal year 2007), despite his receiving job ratings commensurate with a ROC award in the Fall of 2007 *prior to his protected conduct.*  Buehler explained that *after* Murphree's Fall 2007 job ratings and *before* the 2008 ROC awards, she

learned through the investigative report of the problems with sexually inappropriate conduct occurring at the Gadsden district office through the investigative report, attributed those problems in part to Murphree's leadership failure based on the report's findings, and consequently, felt that he did not merit a ROC award.  She testified that she would not have rated Murphree as highly in the Fall of 2007 had she known about the ongoing issues at the office under his watch.   The pretext analysis here corresponds closely with the pretext analysis above regarding Murphree's discipline because Buehler gave the same reasons for disciplining Murphree as she did for not awarding him a ROC.  Accordingly, to the extent that the pretext analyses coincide, they have the same result, failing raise a genuine issue of material fact to support pretext.  Regardless of whether the investigative report was correct, an independent team conducted it and not Murphree's supervisor;  Buehler's reliance on it in making the award decision does not establish pretext.

In addition, Murphree claims that the failure to award him a ROC, who engaged in protected conduct, and yet awarding the ROC to the rest of his management team, who did not engage in protected conduct, is an inconsistency and contradiction that raises a genuine issue of material fact as to pretext.

In her deposition testimony, Buehler explained that the person responsible for making a ROC award decision is each employee's immediate supervisor.  Therefore, as Murphree's immediate supervisor, Buehler would make the decision whether to recommend him for the ROC award.  However, Buehler would not be responsible for making award recommendations for the rest of the Gadsden district office management team; Murphree would make those award decisions, as Lott and Allen's immediate supervisor.  Accordingly, because  different supervisors

made the ROC award decisions, the decisions were not truly inconsistent.

Further, the supervisors acknowledged basing the differing awards decisions for the Gadsden management team on different factors.  Buehler based her award decision regarding Murphree in large part on the investigative report findings of management team misconduct and leadership failures. On the other hand, Murphree did not base his award decision regarding Lott and Allen on the investigative report findings because he disagreed with findings implicating him in management team misconduct and leadership failures.

Thus, the Agency has provided non-retaliatory reasons for its refusal to give Murphree a ROC award in 2008.  Murphree quarrels with the decision, but to meet his burden on pretext, he must do more than that:  he must cast sufficient doubt that the reasons were true by demonstrating "'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence.'"  *Combs,* 106 F.3d at 1538 (quoting *Sheridan v. E.I. DuPont de Nemours & Co.,* 100 F.3d 1061, 1072 (3rd. Cir. 1996)). Here, he has not demonstrated that the reason for failing to award Murphree a ROC was implausible, inconsistent, incoherent or otherwise would cause a reasonable juror to doubt the truth of the Agency's explanation. The court's role here is not to second-guess an employer's legitimate business decisions but merely to address whether Murphree has raised a genuine issue of material fact that the decision was impermissibly based on retaliation.  He has not done so.

Accordingly, the court FINDS that Murphree has not met his burden to establish pretext as to the decision on the ROC award, and the motion for summary judgment is due to be GRANTED on that issue.

The failure to use competitive process for the Tennessee DAD Position and to give Murphree an opportunity to apply

The Agency's legitimate, non-discriminatory reason for failing to give Murphree an opportunity to apply for the Tennessee DAD position is two-fold: that Clevenger wanted a Tennessee candidate to get the job who was familiar with the area and familiar to her; and that company procedures do not require the position to be filled through a competitive selection process. Murphree attempts to show pretext by establishing that the company violated its own policies and procedures in not using the competitive selection process to fill the Tennessee DAD position when he says it was required to do so. Noting that agency policy requires competitive process for the move to a position with greater potential for promotion, Murphree characterizes the position of DAD as having more potential for promotion than the position of DM, and thus, argues that the reassignment of Carpenter violated policy and raises an inference of pretext. However, as previously discussed, the evidence does not support his conclusory assertion that the position of DAD has more potential for promotion. In light of the evidence provided, Murphree's own perception alone cannot meet his burden of establishing pretext.

In sum, the court FINDS that the Agency's motion for summary judgment is due to be GRANTED as to all retaliation claims.

## IV. CONCLUSION

For the reasons stated above, the court FINDS that the motion for summary judgment is due to be GRANTED in its entirety.

The court will enter simultaneously with this Amended Memorandum Opinion a

consistent Amended Order.

Dated this 12th day of May, 2014.

KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE